(Nos. 52875, 53788 cons

JAMES ALVIS, Appellant, v. JAMES RIBAR *et al.*, Appellees.—KARIN KROHN, Adm'r, Appellant, v. ABBOTT LABORATORIES, INC., *et al.*, Appellees.

*Opinion filed April 17, 1981.—Modified on denial of rehearing June 4, 1981.*

John Bernard Cashion, of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, William J. Oberts, and David P. Cutler, of counsel), for appellee Milburn Brothers, Inc.

Baker & McKenzie, of Chicago (Francis D. Morrissey and Edward J. Zulkey, of counsel), for *amicus curiae* Illinois Defense Counsel.

Jacobs, Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll and Wyatt Jacobs, of counsel), *amicus curiae.*

David A. Decker, of May, Decker & Associates, Ltd., of Waukegan, for appellant.

James J. DeSanto, of Rawles, Katz, DeSanto & McKeown, Ltd., of Waukegan, for appellees.

Baker & McKenzie, of Chicago (Francis D. Morrissey and Edward J. Zulkey, of counsel), for *amicus curiae* Illinois Defense Counsel.

Jacobs, Williams & Montgomery, Ltd., of Chicago

(Barry L. Kroll and Wyatt Jacobs, of counsel), *amicus curiae.*

MR. JUSTICE MORAN delivered the opinion of the court:

These two cases, consolidated for appeal, present a question which arises solely from the pleadings. In each, plaintiff's complaint included a count based on the doctrine of comparative negligence, which count was dismissed by the trial court on motion by the defendants. In Alvis v. Ribar, the appellate court affirmed summarily, stating, "*** it is not for this court to attempt to reverse the many cases and opinions of the Illinois Supreme Court in this area." (78 Ill. App. 3d 1117, 1119.) This court allowed leave to appeal. In Krohn v. Abbott Laboratories, Inc., we granted a motion for direct appeal under Rule 302(b) (73 Ill. 2d 302(b)).

Plaintiffs ask this court to abolish the doctrine of contributory negligence and to adopt in its place the doctrine of comparative negligence as the law in Illinois.

In Alvis v. Ribar, a motor vehicle operated by defendant Ribar skidded out of control and collided with a metal barrel which anchored an official intersection stop sign. The sign had been temporarily placed at the intersection while construction work on the intersecting road was being done by the defendant contractor, Milburn Brothers, Inc., under the supervision of defendant Cook County. Plaintiff Alvis, who was a passenger in defendant Ribar's vehicle, sustained injuries as a result of the collision. He filed a multicount personal injury complaint seeking damages from all three defendants.

In Krohn v. Abbott Laboratories, Inc., a tractor trailer operated by defendant Sweetwood and owned by defendant Abbott Laboratories, Inc., was traveling west when it collided with an eastbound vehicle operated by decedent, Klaus D. Krohn. The collision occurred in the

eastbound lane. As a result of the collision, Klaus D. Krohn sustained fatal injuries. Plaintiff, Karin D. Krohn, as administrator of the estate of Klaus D. Krohn, brought a wrongful death action in the circuit court of Lake County against both defendants.

I

THE HISTORY OF CONTRIBUTORY NEGLIGENCE

Generally, under the doctrine of contributory negligence, a plaintiff is barred from recovering compensation for his injuries if his negligence contributed to the accident. The origin of the doctrine can be traced to the case of *Butterfield v. Forrester* (1809), 11 East 60, 103 Eng. Rep. 926. There defendant had placed a pole across part of a public road. Plaintiff, riding his horse too fast to see the obstruction, rode into the pole and was injured. The concept of contributory negligence was created by the words of Chief Justice Lord Ellenborough:

> "Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff." *Butterfield v. Forrester* (1809), 11 East 60, 61, 103 Eng. Rep. 926, 927.

The doctrine was swiftly adopted in American jurisprudence, commencing with the case of *Smith v. Smith* (1824), 19 Mass. (2 Pick.) 621, 13 Am. Dec. 464. (See H. Woods, The Negligence Case: Comparative Fault 7 (1978); Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L. Rev. 189, 198 (1950).) Legal scholars attribute the swift and universal acceptance of the doctrine to newly formed industry's need for protection "against the ravages which might have been wrought by over-sympathetic juries." (Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L. Rev. 189, 201 (1950); H. Woods, The Negligence Case: Comparative Fault 8 (1978). Also see *Scott v. Rizzo* (1981), 96 N.M. 682, 685, 634 P.2d 1234, 1237;

*Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 437.) Judicial concern was particularly evident in the area of personal injury suits brought by railroad employees against the railroads. The courts realized that, in the pervading public view that saw railroads as "harmful entities with deep pockets" (H. Woods, The Negligence Case: Comparative Fault 9 (1978)), juries' sympathies toward plaintiffs could wreak financial disaster upon the burgeoning industry.

Case law developed the doctrine of contributory negligence in Illinois. In *Aurora Branch R.R. Co. v. Grimes* (1852), 13 Ill. 585, 587-88, this court followed the *Butterfield* case and added the requirement that the burden of proof is upon the plaintiff to show not only negligence on the part of the defendant, but also that plaintiff himself exercised proper care and circumspection. In the next few years the decisions involving "last clear chance" (*Moore v. Moss* (1852), 14 Ill. 106, 110 (later discussed)), degrees of negligence (*Chicago & Mississippi R.R. Co. v. Patchin* (1854), 16 Ill. 198, 203), and proximate cause (*Joliet & Northern Indiana R.R. Co. v. Jones* (1858), 20 Ill. 221, 227) created confusion. Mr. Justice Breese reviewed these decisions in *Galena & Chicago Union R.R. Co. v. Jacobs* (1858), 20 Ill. 478, a case which involved a 4½-year-old boy who had been run over by a railroad locomotive. There the court ultimately disagreed with the *Butterfield* holding and adopted a form of comparative negligence in its place.

> "This, and all the cases subsequent, to which we have referred, have one common basis, and that is found in the old law maxim that 'no man shall take advantage of his own wrong or negligence' in his prosecution or defense against another." (*Galena & Chicago Union R.R. Co. v. Jacobs* (1858), 20 Ill. 478, 490-91.)

The court concluded that liability does not depend ab-

solutely on the absence of all negligence on the part of the plaintiff but upon the relative degrees of care or want of care manifested by both parties.

> "[A]ll care or negligence is at best but relative, the absence of the highest possible degree of care showing the presence of some negligence, slight as it may be. The true doctrine, therefore, we think is, that in proportion to the negligence of the defendant, should be measured the degree of care required of the plaintiff—that is to say, the more gross the negligence manifested by the defendant, the less degree of care will be required of the plaintiff to enable him to recover. Although these cases do not distinctly avow this doctrine in terms, there is a vein of it very perceptible, running through very many of them, as, where there are faults on both sides, the plaintiff shall recover, his fault being to be measured by the defendant's negligence, the plaintiff need not be wholly without fault ***.
>
> We say, then, that in this, as in all like cases, the degrees of negligence must be measured and considered, and wherever it shall appear that the plaintiff's negligence is comparatively slight, and that of the defendant gross, he shall not be deprived of his action." (*Galena & Chicago Union R.R. Co. v. Jacobs* (1858), 20 Ill. 478, 497.)

Thus, in 1858, Illinois became a State which followed the doctrine of comparative negligence.

In 1870, in the case of *Illinois Central R.R. Co. v. Baches* (1870), 55 Ill. 379, 389-90, the court held:

> "The seventh of appellee's instructions is not accurate, as it nowhere limits or defines the duty of deceased. Under this instruction, the jury were required to find for the plaintiff, although deceased might have been guilty of negligence equal

> to that of appellants. Such has never been recognized as the rule of law in this class of cases. *** [W] e are not inclined to extend the rule, as there is no warrant in the common law for allowing the plaintiff any greater latitude. He should use prudence and care, but failing to do so, and is guilty of negligence, he can not recover, unless the negligence of the defendant clearly and largely exceeds his. This instruction should have been refused, or modified so as to announce the rule of comparative negligence before it was given."

In the case of *Illinois Central R.R. Co. v. Hammer* (1874), 72 Ill. 347, 351, the court attempted to clarify the definition of comparative negligence. "The rule on this subject, it may be, has not at all times been accurately stated by this court. By inadvertence, it has been loosely and indefinitely stated in some of the cases, but what the court has held, and still holds, is, that a plaintiff free from all negligence may recover from a defendant who has failed to use such care as ordinarily prudent men generally employ; or, a plaintiff who is even guilty of slight negligence may recover of a defendant who has been grossly negligent, or whose conduct has been wanton or wilful. Hence the doctrine of comparative negligence."

In 1878, in the case of *Indianapolis & St. Louis R.R. Co. v. Evans* (1878), 88 Ill. 63, 65, the court adhered to the principles of *Baches.*

> " 'It is the duty of a railroad company to take all reasonable precaution for the protection of life and limb from injuries by their cars; and if such precautions are not taken, a person injured in consequence thereof *** has a just cause of complaint, and is entitled to recover damages for any injury sustained by reason of the omission of the company to adopt all reasonable guards against liability to injury, unless such injury is caused by the negli-

gence of the party injured *equal* to or greater than that of the party committing the injury.'

***

This seventh instruction, in substance, says, that plaintiff's action can not be defeated by his own negligence, unless such negligence be at least equal to that of defendant. This is not the law. The true rule on this subject is laid down in *Illinois Central Railroad Co. v. Baches, Admr.* 55 Ill. 379, and need not be further discussed here."

Thus developed the doctrine that the negligence of the plaintiff would not bar his recovery if it was "slight," in the sense of a "degree of negligence less than a failure to exercise ordinary care," while the negligence of the defendant was "gross" in comparison. (*Wabash, St. Louis & Pacific Ry. Co. v. Moran* (1883), 13 Ill. App. 72, 76.) No attempt was made to divide the damages under this "comparative negligence" rule, and where it was applied the effect was full recovery by the plaintiff. The injured person was required to show not only that his negligence was slight and that the defendant's negligence was gross, but also that they were so when compared with each other, since the element of comparison was the essence of the doctrine. *Chicago, Milwaukee & St. Paul Ry. Co. v. Mason* (1888), 27 Ill. App. 450, 453, 454.

During the next 27 years, the rule stated in *Jacobs* was followed and then abandoned by this court in *Calumet Iron & Steel Co. v. Martin* (1885), 115 Ill. 358, 368-69, and *City of Lanark v. Dougherty* (1894), 153 Ill. 163, 165-66, where it unequivocally made any contributory negligence on the part of the plaintiff a complete bar to recovery. Dean Green summarized the reasons for abandonment: the formula was not complete in that the "degrees of negligence" did not mitigate the damages which the plaintiff could recover; the "degrees of negligence" resulted in doctrinal conflict and confusion; and

the *Jacobs* case had not overruled the *Grimes* case, so that, during the lifetime of the *Jacobs* decision, courts of appeal could still rely upon the failure of the plaintiff to prove that he had exercised ordinary care in his own behalf before allowing recovery on a comparative negligence basis. Green, *Illinois Negligence Law,* 39 Ill. L. Rev. 36, 47-51 (1944).

Other jurisdictions found problems in the doctrine of contributory negligence. Criticism of the harshness of the doctrine came as swiftly as did its acceptance into the law, and courts found exceptions to soften that harshness.

The first exception formulated to the rule of contributory negligence was that the negligence of the plaintiff was no defense when the defendant's conduct was "wilful," "wanton," or "reckless." (Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 5 (1953); *Bradley v. Appalachian Power Co.* (W. Va. 1979), 256 S.E.2d 879, 882; *Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 437; *Kirby v. Larson* (1977), 400 Mich. 585, 616, 256 N.W.2d 400, 415.) This rule, however, was found to be cumbersome and difficult to apply. Historically, it is of limited importance.

The second exception that developed was limited to cases involving a defendant's violation of a statute designed to protect the plaintiff even against his own improvident acts. Since only a minute number of cases involved such statutes, the exception did little to alleviate the plight of the negligent plaintiff. Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 5-6 (1953).

Greater relief was found in the creation of a third exception—"last clear chance"—which originated in the 1842 case of *Davies v. Mann* (1842), 10 M. & W. 546, 152 Eng. Rep. 588. In *Davies,* the defendant negligently ran into plaintiff's donkey, which plaintiff had left fettered in the highway. The court ruled that plaintiff's negligence in leaving the donkey in the road did not bar his claim for

damages against defendant, since defendant had the "last clear chance" to avoid the accident. The basic concept resembles the effect of a superseding event nullifying the negligence of a plaintiff. Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 6-7 (1953).

The application of the third exception has by no means been uniform. Dean Prosser suggested that "[t]he real explanation would appear to be nothing more than a dislike for the defense of contributory negligence, and a rebellion against its application in a group of cases where its hardship is most apparent." (Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 7 (1953).) Illinois courts have expressly found the doctrine of "last clear chance" not to be the law of the State. (*Specht v. Chicago City Ry. Co.* (1924), 233 Ill. App. 384. Contra, *Moore v. Moss* (1852), 14 Ill. 106.) Dean Prosser has stated that although the doctrine has been repudiated in this State, it is nonetheless employed without labeling. Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 8 (1953). See *Walldren Express & Van Co. v. Krug* (1920), 291 Ill. 472, 477, employing the phrase "conscious indifference to consequences."

Comparative negligence made its first permanent entry into American law in 1908 in the form of the Federal Employers' Liability Act (45 U.S.C. sec. 53). The Act applied to all negligence cases for injuries sustained by railroad employees engaged in interstate commerce, whether such cases were brought in a State or a Federal court. The concept of comparative negligence provided that the contributory negligence of the employee would not act as a bar to recovery, but that recovery would be diminished in proportion to the amount of negligence attributable to him. (Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 11-12 (1953); V. Schwartz, Comparative Negligence 11 (1974); H. Woods, The Negligence Case: Comparative Fault 24, 29 (1978).) The introduction of

the Federal Employers' Liability Act was the catalyst for a flood of State statutes which established a comparative negligence standard for injuries to laborers, and, especially, for railroad employees. Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 12-13 (1953).

In 1920, Congress adopted comparative negligence for cases arising under the Jones Act (Act of June 5, 1920, ch. 250, sec. 33, 41 Stat. 1007, 46 U.S.C. sec. 688) and under the Death on the High Seas Act (Act of March 30, 1920, ch. 111, sec. 6, 41 Stat. 537, 46 U.S.C. sec. 766). See Prosser, *Comparative Negligence,* 41 Cal L. Rev. 1, 12 (1953); V. Schwartz, Comparative Negligence 11, (1974); H. Woods, The Negligence Case: Comparative Fault 52 (1978); *Kaatz v. State* (Alaska 1975), 540 P.2d 1037, 1047.

In 1910, Mississippi became the first State to adopt a comparative negligence statute applicable to negligence cases generally. (Miss. Code Ann. sec. 11—7—15 (1972).) The statute adopted the "pure" form of comparative negligence under which each responsible party would pay for the injuries sustained according to the relative percentage of his fault. Another form of comparative negligence was enacted by Wisconsin in 1931. (Wis. Stat. Ann. sec. 895.045 (West 1966).) This "modified" form allowed a negligent plaintiff to recover for his injuries only if his negligence was "not as great as that of the defendant."

Today, a total of 36 States have adopted comparative negligence. The following is a list of States which have adopted the doctrine, indicating its source and form.

(1) Alaska—*Kaatz v. State* (Alaska 1975), 540 P.2d 1037 (pure).

(2) Arkansas—Ark. Stat. Ann. secs. 27—1763 to 27—1765 (1979) (modified).

(3) California—*Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 532 P.2d 1226, 119 Cal. Rptr. 858 (pure).

(4) Colorado—Colo. Rev. Stat. sec. 13—21—111 (1973 & Supp. 1978) (modified).

(5) Connecticut—Conn. Gen. Stat. Ann. sec. 52—572n (West Supp. 1980) (modified).

(6) Florida—*Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431 (pure).

(7) Georgia—Ga. Code Ann. sec. 105—603 (1968) (unique).

(8) Hawaii—Haw. Rev. Stat. sec. 663—31 (1976) (modified).

(9) Idaho—Idaho Code secs. 6—801, 6—802 (1979) (modified).

(10) Kansas—Kan. Stat. sec. 60—258a (1976) (modified).

(11) Louisiana—La. Civ. Code Ann. art. 2323 (eff. Aug. 1, 1980) (West 1981 Supp.) (pure).

(12) Maine—Me. Rev. Stat. tit. 14, sec. 156 (1980) (modified).

(13) Massachusetts—Mass. Gen. Laws Ann. ch. 231, sec. 85 (Supp. 1978) (modified).

(14) Michigan—*Placek v. City of Sterling Heights* (1979), 405 Mich. 638, 275 N.W.2d 511 (pure).

(15) Minnesota—Minn. Stat. Ann. sec. 604.01 (Supp. 1981) (modified).

(16) Mississippi—Miss. Code Ann. sec. 11—7—15 (1972) (pure).

(17) Montana—Mont. Rev. Codes Ann. sec. 58—607.1 (Supp. 1977) (modified).

(18) Nebraska—Neb. Rev. Stat. sec. 25—1151 (1979) (slight/gross).

(19) Nevada—Nev. Rev. Stat. sec. 41.141 (1979) (modified).

(20) New Hampshire—N.H. Rev. Stat. Ann. sec. 507:7—a (Supp. 1979) (modified).

(21) New Jersey—N.J. Stat. Ann. secs. 2A:

15—5.1 to 2A: 15—5.3 (Supp. 1980-81) (modified).

(22) New Mexico—*Claymore v. City of Albuquerque* (N.M. App. Dec. 8, 1980), Nos. 4804, 4805 (pure).

(23) New York—N.Y. Civ. Prac. Law secs. 1411 to 1413 (1976) (pure).

(24) North Dakota—N.D. Cent. Code sec. 9—10—07 (1975) (modified).

(25) Oklahoma—Okla. Stat. Ann. tit. 23, secs. 13 to 14 (West Supp. 1980-81) (modified).

(26) Oregon—Or. Rev. Stat. secs. 18.470, 18.475, 18.480, 18.485, 18.490 (1979) (modified).

(27) Pennsylvania—Pa. Stat. Ann. tit. 42, sec. 7102a (Purdon Supp. 1980) (modified).

(28) Rhode Island—R.I. Gen. Laws sec. 9—20—4 (Supp. 1980) (pure).

(29) South Dakota—S.D. Compiled Laws Ann. sec. 20—9—2 (1979) (slight/gross).

(30) Texas—Tex. Rev. Civ. Stat. Ann. art. 2212(a) (Vernon's Supp. 1979) (modified).

(31) Utah—Utah Code Ann. secs. 78—27—37, 78—27—38, 78—27—41 (1977) (modified).

(32) Vermont—Vt. Stat. Ann. tit. 12, sec. 1036 (1973) (modified).

(33) Washington—Wash. Rev. Code Ann. sec. 4.22.010 (Supp. 1980) (pure).

(34) West Virginia—*Bradley v. Appalachian Power Co.* (W. Va. 1979), 256 S.E.2d 879 (modified).

(35) Wisconsin—Wis. Stat. Ann. sec. 895.045 (West Supp. 1980) (modified).

(36) Wyoming—Wyo. Stat. sec. 1—1—109 (1977) (modified).

(Note: Missouri adopted comparative "fault" in third-

party noncontractual indemnity actions by judicial decision in *Missouri Pacific R.R. Co. v. Whitehead & Kales Co.* (Mo. 1978), 566 S.W.2d 466.)

Twenty-three States have adopted the Wisconsin "modified" approach. Ten States have adopted the Mississippi "pure" comparative negligence approach. Two States, Nebraska and South Dakota, have a system which allows the plaintiff to recover only if his negligence is "slight" and that of defendant's is "gross." Georgia has its own unique system. It is important to note that 29 of these 36 States have adopted comparative negligence in the last 12 years.

In England, the birthplace of *Butterfield v. Forrester*, the concept of contributory negligence was long ago abandoned and replaced by a system of comparative negligence. (*Maki v. Frelk* (1967), 85 Ill. App. 2d 439, 448, *rev'd on other grounds* (1968), 40 Ill. 2d 193.) Similarly, in many jurisdictions outside the United States the rule of contributory negligence has been abandoned in favor of comparative negligence. (Canada, the Canal Zone, Switzerland, Spain, Portugal, Austria, Germany, France, the Philippines, Japan, Russia, New Zealand, West Australia, Poland, and Turkey. See H. Woods, The Negligence Case: Comparative Fault 17 (1978); Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 2 (1953); Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L. Rev. 189, 238-45 (1950).) In light of these changes the Supreme Court of Michigan, in *Placek v. City of Sterling Heights* (1979), 405 Mich. 638, 653, 275 N.W.2d 511, 515, stated:

> "This precedent is so compelling that the question before remaining courts and legislatures is not whether but when, how and in what form to follow this lead."

## II

## CONTRIBUTORY NEGLIGENCE v. COMPARATIVE NEGLIGENCE

The contributory negligence defense has been subject to attack because of its failure to apportion damages according to the fault of the parties. Under a comparative negligence standard, the parties are allowed to recover the proportion of damages not attributable to their own fault. The basic logic and fairness of such apportionment is difficult to dispute.

The defendants herein claim that no change of circumstances has been shown which would call for a change from the established doctrine of contributory negligence. The Illinois Defense Counsel, in its *amicus curiae* brief, relies on the words of Mr. Justice Powell for the proposition that change is not demanded by the public.

> "[T]here is little evidence that the public generally is concerned. If indeed the present rule is as 'archaic' and 'unjust' as is contended, one would normally expect much greater support for the organized efforts being made to abolish it." Powell, *Contributory Negligence: A Necessary Check on the American Jury,* 43 A.B.A.J. 1005, 1008 (1957).

It must be noted, however, that at the time of Mr. Justice Powell's quoted assessment, only six States had adopted the doctrine of comparative negligence. That 30 additional States have since adopted the doctrine evidences that the basis for the assessment has changed and that today there is, indeed, a compelling public demand to abolish the old rule. Certainly, the concern which prompted the adoption of the rule can no longer support its retention. There is no longer any justification for providing the protective barrier of the contributory negligence rule for industries of the nation at the expense of deserving litigants. (*Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 437.) It must be pointed out that today most cases against industrial defendants are brought under the Worker's Compensation Act, under which plaintiff's negligence is not an issue. (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.; Maki v.*

*Frelk* (1967), 85 Ill. App. 2d 439, 441, *rev'd on other grounds* (1968), 40 Ill. 2d 193.) The United States Supreme Court recognized the obsolescence of the rule in relation to present-day needs in one sphere of the law:

> "The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice." (*Pope & Talbot v. Hawn* (1953), 346 U.S. 406, 408-09, 98 L. Ed. 143, 150, 74 S. Ct. 202, 204.)

We believe that the concept of comparative negligence which produces a more just and socially desirable distribution of loss is demanded by today's society.

Defendants contend that the apportionment of relative fault by a jury cannot be scientifically done, as such precise measurement is impossible. The simple and obvious answer to this contention is that in 36 jurisdictions of the United States such apportionment is being accomplished by juries. The Supreme Court of California, in responding to a similar contention, stated:

> "These inherent difficulties are not, however, insurmountable. Guidelines might be provided the jury which will assist it in keeping focussed upon the true inquiry [citation], and the utilization of special verdicts or jury interrogatories can be of invaluable assistance in assuring that the jury has approached its sensitive and often complex task with proper standards and appropriate reverence." (*Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 824, 532 P.2d 1226, 1240, 119 Cal. Rptr. 858, 872.)

We agree that such guidelines can assist a jury in making apportionment decisions and view the necessary subtle calculations no more difficult or sophisticated for jury determination than others in a jury's purview, such as

compensation for pain and suffering. Although it is admitted that percentage allocations of fault are only approximations, the results are far superior to the "all or nothing" results of the contributory negligence rule. "Small imperfections can be disregarded, small inequities tolerated, if the final result is generally satisfactory." Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L. Rev. 189, 341-42 (1950).

Defendants assert that the contributory negligence rule should be retained in that the comparative negligence doctrine rewards carelessness and ignores the value of requiring prudent behavior. The fallacy of this premise was underscored by Dean Prosser:

> "[T]he assumption that the speeding motorist is, or should be meditating on the possible failure of a lawsuit for his possible injuries lacks all reality, and it is quite as reasonable to say that the rule promotes accidents by encouraging the negligent defendant." (Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 4 (1953).)

(See *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 811 n.4, 532 P.2d 1226, 1231 n.4, 119 Cal. Rptr. 858, 863 n.4; *Kaatz v. State* (Alaska 1975), 540 P.2d 1037, 1048; *Kirby v. Larson* (1977), 400 Mich. 585, 619 n.29, 256 N.W.2d 400, 416 n.29.) Contrary to defendants' assertion, we believe that the need to deter negligent parties supports the adoption of the comparative negligence doctrine in which each party would be liable for damages in direct proportion to his degree of carelessness.

Defendants claim that the change to comparative negligence will cause administrative difficulties due to an increase in claims, a decrease in settlements, and a resulting overcrowded docket. An Arkansas study showed that, there, the adoption of comparative negligence prompted no drastic change in court burden; that the change increased potential litigation but promoted more pretrial settlements. The report concluded that concern over court congestion should not be a factor in a State's deci-

sion to adopt comparative negligence. Rosenberg, *Comparative Negligence in Arkansas; A "Before and After" Survey,* 13 Ark. L. Rev. 89, 108 (1959). See Also Note, *Comparative Negligence—A Survey of the Arkansas Experience,* 22 Ark. L. Rev. 692 (1969).

In *United States v. Reliable Transfer Co.* (1975), 421 U.S. 397, 44 L. Ed. 2d 251, 95 S. Ct. 1708, wherein the court adopted apportionment of damages over the previous rule of divided damages in admiralty, the court addressed an argument similar to that posited by defendants herein.

> "[Defendants ask] us to continue the operation of an archaic rule because its facile application out of court yields quick, though inequitable, settlements, and relieves the courts of some litigation. Congestion in the courts cannot justify a legal rule that produces unjust results in litigation simply to encourage speedy out-of-court accommodations." (*United States v. Reliable Transfer Co.* (1975), 421 U.S. 397, 408, 44 L. Ed. 2d 251, 261, 95 S. Ct. 1708, 1714.)

We believe that the defendants' fears concerning the judicial administrative problems attendant upon the adoption of comparative negligence are exaggerated. (*Kaatz v. State* (Alaska 1975), 540 P.2d 1037, 1048; *Scott v. Rizzo* (1981), 96 N.M. 682, 687, 634 P.2d 1234, 1239.) But were defendants' fears well founded, we could nevertheless not allow the contributory negligence rule to remain the law of this State in the face of overwhelming evidence of its harsh and unjust results.

Defendants' claim that the adoption of comparative negligence would escalate insurance rates to an unbearable level. This has not been found to be the case. Effects, in fact, have been found to be minimal. Rosenberg, *Comparative Negligence in Arkansas: A "Before and After" Survey,* 13 Ark. L. Rev. 89, 108 (1959). See V. Schwartz, Com-

parative Negligence 338 (1974); Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Cal. L. Rev. 239, 243-44 (1976).

The *amicus curiae* brief submitted by the Illinois Defense Counsel suggests that, under the contributory negligence rule, the jury has sufficient flexibility to do substantial justice and that this flexibility negates the necessity for the adoption of comparative negligence. In essence, the Illinois Defense Counsel alludes to the oft-observed phenomenon that, once inside the jury room, juries often ignore the harshness of the contributory negligence rule and, instead, dole out justice by a common sense approach according to the relative culpability of the litigants. We agree that such may be the case and, in fact, find the proclivity of juries to ignore the law to be a compelling reason for the abolition of that law. The Supreme Court of Florida addressed this concern.

> "[T]here is something basically wrong with a rule of law that is so contrary to the settled convictions of the lay community that laymen will almost always refuse to enforce it, even when solemnly told to do so by a judge whose instructions they have sworn to follow.
>
> ***
>
> The disrespect for law engendered by putting our citizens in a position in which they feel it is necessary to deliberately violate the law is not something to be lightly brushed aside; and it comes ill from the mouths of lawyers, who as officers of the courts have sworn to uphold the law, to defend the present system by arguing that it works because jurors can be trusted to disregard that very law." (*Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 437.)

There is something inherently wrong with a rule of law so repulsive to a jury's common sense of justice that venire-

men feel compelled to ignore the law. *Scott v. Rizzo* (1981), 96 N.M. 682, 689, 634 P.2d 1234, 1241; *Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 437; *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 811, 532 P.2d 1226, 1231, 119 Cal. Rptr. 858, 863; Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Cal. L. Rev. 239, 242-43 (1976); Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 4 (1953).

III

JUDICIAL v. LEGISLATIVE CHANGE

It is urged by defendants that the decision to replace the doctrine of contributory negligence with the doctrine of comparative negligence must be made by the legislature, not by this court. In each of the States that have judicially adopted comparative negligence, the court addressed the propriety of judicial versus legislative adoption. In each, the court found that contributory negligence is a judicially created doctrine which can be altered or totally replaced by the court which created it. (*Scott v. Rizzo* (1981), 96 N.M. 682, 686-87, 634 P.2d 1234, 1238-39; *Placek v. City of Sterling Heights* (1979), 405 Mich. 638, 657, 275 N.W.2d 511, 517; *Bradley v. Appalachian Power Co.* (W. Va. 1979), 256 S.E.2d 879, 881; *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 813-14, 532 P.2d 1226, 1232-33, 119 Cal. Rptr. 858, 864-65; *Kaatz v. State* (Alaska 1975), 540 P.2d 1037, 1049; *Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 434. See *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 13-14.) Indeed, the United States Supreme Court deemed it appropriate to " 'adopt the proportional fault doctrine without Congressional action.' " *United States v. Reliable Transfer Co.* (1975), 421 U.S. 397, 410, 44 L. Ed. 2d 251, 261, 95 S. Ct. 1708, 1715.

The Illinois Defense Counsel has, in its brief, urged that the legislature is better equipped to enact comparative

negligence, asserting that "the legislative process *** involves a broad examination of the entire problem without emphasis on a particular fact situation." The Defense Counsel and defendants claim that judicial adoption of comparative negligence would result in a piecemeal approach that would leave for future cases many ancillary questions. They claim that the law would be left in confusion and turmoil.

An examination of the States from which comparative negligence statutes have emerged reveals that such statutes are very general and brief and do not address collateral issues. Rather, the legislators apparently deemed it wise to leave the solution of collateral issues to the courts. *Placek v. City of Sterling Heights* (1979), 405 Mich. 638, 658, 275 N.W.2d 511, 518; *Kirby v. Larson* (1977), 400 Mich. 585, 630, 256 N.W.2d 400, 422; Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Cal. L. Rev. 239, 281 (1976); V. Schwartz, Comparative Negligence 360-61 (1974).

Defendants point out that, since 1976, six bills were introduced in the Illinois legislature to abolish the doctrine of contributory negligence (Senate Bill 1674 on April 6, 1976, referred to committee; House Bill 1093, introduced March 29, 1977; House Bill 1368, introduced March 31, 1977; House Bill 1614, introduced April 1, 1977; House Bill 542, introduced February 21, 1979; House Bill 784, introduced March 8, 1979). They interpret the failure of each bill to pass as a sign of the General Assembly's desire to retain the present status of the rule. Another conclusion may be drawn, however, as pointed out by Mr. Justice Ward in his dissenting opinion in *Maki v. Frelk* (1968), 40 Ill. 2d 193, 203:

> "It can be argued that the legislature's inaction in this area is attributable to its feeling that it is more appropriate, considering the history of the question in Illinois, for the judiciary to act."

See *Scott v. Rizzo* (1981), 96 N.M. 682, 686-87, 634 P.2d 1234, 1238-39; *Kirby v. Larson* (1977), 400 Mich. 585, 627-28, 256 N.W.2d 400, 420; *Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 438; Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Cal. L. Rev. 239, 277 (1976).

In support of their view that the legislature intends to retain the rule, defendants point to various statutes which have incorporated the contributory negligence defense (Ill. Rev. Stat. 1979, ch. 24, par. 1—4—4 (regarding liability for injuries caused by firemen); Ill. Rev. Stat. 1979, ch. 24, pars. 1—4—5, 1—4—6 (indemnification for injuries caused by policemen); Ill. Rev. Stat. 1979, ch. 34, par. 301.1 (indemnity of sheriff or deputy); Ill. Rev. Stat. 1979, ch. 121, pars. 385, 386 (tort liability of county superintendent of highways); and Ill. Rev. Stat. 1979, ch. 127½, par. 46 (liability of firemen for injuries to person or property)). They claim that these statutes act as a legislative ratification of the doctrine of contributory negligence. We do not agree. We believe that in enacting such statutes the legislature did not focus on the merits of the contributory negligence rule, but, rather, conformed the statutes to the then-existing law as announced by the court.

We believe that the proper relationship between the legislature and the court is one of cooperation and assistance in examining and changing the common law to conform with the ever-changing demands of the community. There are, however, times when there exists a mutual state of inaction in which the court awaits action by the legislature and the legislature awaits guidance from the court. Such a stalemate is a manifest injustice to the public. When such a stalemate exists and the legislature has, for whatever reason, failed to act to remedy a gap in the common law that results in injustice, it is the imperative duty of the court to repair that injustice and reform the

law to be responsive to the demands of society.

IV

STARE DECISIS

Defendants urge us to abide by the doctrine of *stare decisis* and follow the holding in *Maki v. Frelk* (1968), 40 Ill. 2d 193. They contend that it is crucial to the due administration of justice, especially in a court of last resort, that a question once deliberately examined and decided be closed to further scrutiny. It must first be pointed out that the *Maki* decision, filed 13 years ago, did not, as claimed by defendants, address the merits of the case. On the contrary, the court avoided the merits by holding that the problem was one for the legislature.

It is interesting to observe that if Illinois courts had, in fact, rigidly adhered to the *stare decisis* rule throughout this State's legal history, the comparative standard could not have been adopted in *Galena & Chicago Union R.R. Co. v. Jacobs* (1858), 20 Ill. 478. Similarly, the comparative rule could not have been later discarded in *Calumet Iron & Steel Co. v. Martin* (1885), 115 Ill. 358, and *City of Lanark v. Dougherty* (1894), 153 Ill. 163.

The tenets of *stare decisis* cannot be so rigid as to incapacitate a court in its duty to develop the law. (*Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, 26.) Clearly, the need for stability in law must not be allowed to obscure the changing needs of society or to veil the injustice resulting from a doctrine in need of reevaluation. This court can no longer ignore the fact that Illinois is currently out of step with the majority of States and with the common law countries of the world. We cannot continue to ignore the plight of plaintiffs who, because of some negligence on their part, are forced to bear the entire burden of their injuries. Neither can we condone the policy of allowing defendants to totally escape liability for injuries arising from their own negligence on the pretext that another party's negli-

gence has contributed to such injuries. We therefore hold that in cases involving negligence the common law doctrine of contributory negligence is no longer the law in the State of Illinois, and in those instances where applicable it is replaced by the doctrine of comparative negligence.

V

THE "PURE" VERSUS THE "MODIFIED" FORM OF COMPARATIVE NEGLIGENCE

There remains the question of the form of comparative negligence to be adopted. Under a "pure" form, the plaintiff's damages are simply reduced by the percentage of fault attributable to him. Under a "modified" form, a negligent plaintiff may recover so long as the percentage of his fault does not exceed 50% of the total.

Defendants argue that should this court decide to adopt comparative negligence, the modified approach should be selected. They point to the basic unfairness of the "pure" system by example: A plaintiff who is 90% negligent has suffered $100,000 in damages. A defendant who is only 10% negligent has suffered only $10,000 in damages. Defendants here point out the basic unfairness of requiring the 10% negligent defendant to pay $10,000 to a plaintiff who was 90% at fault. The United States Supreme Court answered a similar claim concerning liability under admiralty law.

> "That a vessel is primarily negligent does not justify its shouldering all responsibility, nor excuse the slightly negligent vessel from bearing any liability at all." (*United States v. Reliable Transfer Co.* (1975), 421 U.S. 397, 406, 44 L. Ed. 2d 251, 259, 95 S. Ct. 1708, 1713.)

The liability of a defendant should not depend upon what damages he sustained but should be determined by the relationship of his fault to the ultimate damages. In a suit under a "pure" form of comparative negligence in which the defendant counterclaims for his own damages,

each party must bear the burden of the percentage of damages of all parties in direct proportion to his fault. In the example above, the 90% negligent plaintiff will bear 90% of his own damages as well as 90% of defendant's. On the other hand, the 10% negligent defendant will be made to bear 10% of his own damages as well as 10% of plaintiff's. Neither party is unjustly enriched. Neither party escapes liability resulting from his negligent acts or omissions. It is difficult to see unfairness in such a distribution of liability. See *Hoffman v. Jones* (Fla. 1973), 280 So. 2d 431, 439; *Scott v. Rizzo* (1981), 96 N.M. 682, 689-90, 634 P.2d 1234, 1241-42; V. Schwartz, Comparative Negligence 345 (1974).

Opponents of the "pure" form of comparative negligence claim that the "modified" form is superior in that it will increase the likelihood of settlement and will keep down insurance costs. However, studies done comparing the effects of the "pure" versus the "modified" forms show the differences in insurance rates to be inconsequential. (V. Schwartz, Comparative Negligence 346 (1974).) Fears as to the likelihood of settlement are not supported in fact or logic. It is argued that the negligent plaintiff will refuse to settle knowing that, under the "pure" system he will be able to recover "something" in court. The converse can as easily apply: the defendant may be encouraged to settle knowing that he cannot rely on the "modified" 50% cut-off point to relieve him of liability. A comparison of results under both the "pure" and "modified" forms showed that in Arkansas there was only a slight decrease in number of settlements when the State changed from "pure" to "modified." Rosenberg, *Comparative Negligence in Arkansas: A "Before and After" Survey*, 13 Ark. L. Rev. 89 (1959).

Wisconsin's "modified" system has been criticized

because a large number of cases appealed focused on the narrow question of whether plaintiff's negligence amounted to 50% or less of the aggregate. (Prosser, *Comparative Negligence,* 41 Cal. L. Rev. 1, 23 (1953).) This, in fact, caused the Wisconsin Supreme Court to examine the question of whether the "modified" system should be replaced with the "pure" form of comparative negligence. (*Vincent v. Pabst Brewing Co.* (1970), 47 Wis. 2d 120, 177 N.W.2d 513.) There, as in *Maki v. Frelk* (1968), 40 Ill. 2d 193, the merits of the case were not addressed, for the majority of the court ruled that the determination should be left to the legislature, which had originally adopted the "modified" form by statute. One dissenting and three concurring justices, however, expressed their intent to judicially adopt the "pure" form if the legislature failed to do so. See *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 829, 532 P.2d 1226, 1243, 119 Cal. Rptr. 858, 875; *Placek v. City of Sterling Heights* (1979), 405 Mich. 638, 660-61, 375 N.W.2d 511, 519; *Kirby v. Larson* (1977), 400 Mich. 585, 642-44, 256 N.W.2d 400, 428.

The "pure" form of comparative negligence is the only system which truly apportions damages according to the relative fault of the parties and, thus, achieves total justice. We agree with the *Li* court that "the '50 percent' system simply shifts the lottery aspect of the contributory negligence rule to a different ground." (*Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 827, 532 P.2d 1226, 1242, 119 Cal. Rptr. 858, 874.) There is no better justification for allowing a defendant who is 49% at fault to completely escape liability than there is to allow a defendant who is 99% at fault under the old rule to escape liability.

Mindful of the facts stated and that the vast majority of legal scholars who have studied the area recommend

the "pure" approach, we are persuaded that the "pure" form of comparative negligence is preferable, and we therefore adopt it as the law of Illinois.

The collateral issue of contribution among joint tortfeasors has already been resolved under the principles of comparative negligence in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 14, wherein this court found that "governing equitable principles require that ultimate liability for plaintiff's injuries be apportioned on the basis of the relative degree to which [each defendant's] conduct proximately caused them." (See also Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*) We have already noted that the doctrine of "last clear chance" was created to escape the harshness of the contributory negligence rule. As the need for it disappears in the face of this decision, the vestiges of the doctrine of "last clear chance" are hereby abolished.

We believe that the use of special verdicts and special interrogatories will serve as a guide to assist the jury in its deliberations. We leave the resolution of other collateral issues to future cases.

## VI

### APPLICATION

Finally, we address the question of the applicability of the rule here announced. We hold that this opinion shall be applied to the parties before us on appeal and to all cases in which trial commences on or after June 8, 1981, the date on which the mandate in this case shall issue. This opinion shall not be applicable to any case in which trial commenced before that date—except that if any judgment be reversed on appeal for other reasons, this opinion shall be applicable to any retrial.

For the reasons stated, we hereby abolish the common law doctrine of contributory negligence and adopt in its place the doctrine of comparative negligence in its pure form. The judgments of the appellate court and circuit courts are reversed and the causes are remanded to the

respective circuit courts for further proceedings in accordance with the views expressed herein.

*Reversed and remanded.*

MR. JUSTICE UNDERWOOD, dissenting:

While I acknowledge the court's power to radically change a rule of law which has existed in this State for nearly a century, I still believe, as I did when *Maki v. Frelk* (1968), 40 Ill. 2d 193, was decided, that the decision to change is best left to the General Assembly.

The action which is taken today by a majority of my colleagues is not unforeseen. (*Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 20 (Underwood, J., dissenting).) That fact does not, however, make its wisdom less questionable. One of the major problems with a judicially decreed change of this magnitude is its effect upon a great many other, related areas of law. What modifications, for example, are now to be made in the doctrines of strict products liability (*Daly v. General Motors Corp.* (1978), 20 Cal. 3d 725, 575 P.2d 1162, 144 Cal. Rptr. 380), assumption of the risk, wilful and wanton misconduct, the liability of property owners to licensees, invitees, and trespassers, and many others? While the newly decreed rule of comparative negligence may ultimately affect all of these situations to a now unknown degree, the court can consider only one case at a time. Unless the legislature acts, it will in all probability be years before these questions can be judicially answered. Meanwhile, litigants and the trial courts must attempt to predict the manner in which this court will eventually resolve these now unresolved questions. The fact that the General Assembly could, if it considered a change desirable, adopt one of the comprehensively drafted bills with which it has been presented and resolve these related questions simultaneously is, to me, a persuasive reason for this court to exercise a greater degree of judicial restraint.

There are other reasons to prefer legislative action. If a

change is to be made, what should the new rule be? The majority chooses the "pure" form of comparative negligence because it "is the only system which truly apportions damages according to the relative fault of the parties and, thus, achieves total justice." (85 Ill. 2d at 27.) That is not, however, a universal view. The Supreme Court of Appeals of West Virginia, in adopting a modified form of comparative negligence, had this to say of the pure form:

> "While it can be conceded that there is an obvious injustice in the current contributory negligence rule which bars recovery no matter how light the plaintiff's negligence, nevertheless the pure comparative negligence rule seems equally extreme at the other end of the spectrum.
>
> ***
>
> The history of the common law is one of gradual judicial development and adjustment of the case law to fit the changing conditions of society. We see no practical benefit to be gained by the radical break from the common law's tort-fault methodology that the pure comparative negligence rule requires. There are basic inequities inherent in the pure comparative negligence rule and its resulting singular emphasis on the amount of damages and insurance coverage as the ultimate touchstone of the viability of instituting a suit.
>
> We do not accept the major premise of pure comparative negligence that a party should recover his damages regardless of his fault, so long as his fault is not 100 percent. Without embarking on an extended philosophical discussion of the nature and purpose of our legal system, we do state that in the field of tort law we are not willing to abandon the concept that where a party substantially contributes to his own damages, he should not be permitted to recover for any part of them.

We do recognize that the present rule that prohibits recovery to the plaintiff if he is at fault in the slightest degree is manifestly unfair, and in effect rewards the substantially negligent defendant by permitting him to escape any responsibility for his negligence.

* * *

By way of summary, we believe that moderating the harshness of our contributory negligence rule achieves a more satisfactory balance in the allocation of fault as it relates to recovery in our tort system. Our comparative negligence rule still bars the substantially negligent plaintiff from obtaining a recovery, but it does permit the plaintiff who is more than slightly at fault to recover his injuries diminished by his percentage of contributory negligence. The rule is an intermediate position between the absolute bar of the present contributory negligence rule and the almost total permissiveness of the pure comparative negligence rule. It represents a considerable improvement over the present rule without undertaking a radical change in our present fault-based tort system, as would be the case with pure comparative negligence." *Bradley v. Appalacian Power Co.* (W. Va. 1979), 256 S.E.2d 879, 883-85, 887.

While I do not totally disagree with the proposition that modification of our heretofore existing contributory negligence rule is desirable, I am not at all certain that the pure form of comparative negligence is the preferred substitute. If it is, it seems odd that of the 36 States which have adopted some form of comparative negligence approximately two thirds have chosen a modified form. And, while the majority says the pure form "achieves total justice," the fact that this form permits a grossly negligent but severely injured plaintiff to recover substan-

tial damages from a slightly negligent defendant with only minor injuries certainly represents a radical departure from the concept of individual responsibility which has heretofore underlain our system of tort law. Despite the assertion by the majority that the pure form produces a utopian form of justice, most of the States adopting a comparative negligence rule have preferred to deny recovery to one whose own negligence was the principal cause of his injuries.

Whether a change is desirable, and, if so, what that change should be, are major policy questions. Their resolution will have a substantial effect upon the people of this State. Recovery will henceforth be possible for conduct of a significantly less reprehensible nature than heretofore. Litigation will surely increase, thus augmenting the burden upon our already overburdened courts, and insurance rates will likely rise in unknown amounts. Policy choices such as those involved here are, it seems to me, best left to the judgment of a General Assembly staffed and equipped to explore, consider, and resolve simultaneously these many-faceted questions.

The majority emphasizes as justification for its action the cliche that courts which created a rule can modify it, and cites cases from some six States which have adopted comparative negligence. There are a greater number, including *Maki,* to the contrary (*Baab v. Shockling* (1980), 61 Ohio St. 2d 55, 56-57, 399 N.E.2d 87, 88; *McGraw v. Corrin* (Del. 1973), 303 A.2d 641, 644; *Codling v. Paglia* (1973), 32 N.Y.2d 330, 344-45, 298 N.E.2d 622, 630, 345 N.Y.S.2d 461, 472 (legislature has since adopted comparative negligence); *Krise v. Gillund* (N.D. 1971), 184 N.W.2d 405, 409 (legislature has since adopted comparative negligence); *Bridges v. Union Pacific R.R. Co.* (1971), 26 Utah 2d 281, 285, 488 P.2d 738, 740 (legislature has since adopted comparative negligence); *Peterson v. Culp* (1970), 255 Or. 269, 272, 465 P.2d 876, 877 (legislature

has since adopted comparative negligence)). Representative comments by some of the courts which have resisted importunings to legislate on this subject are also significant:

> "This court does not deem it necessary at this time to discuss the positive and negative aspects of the doctrine of comparative negligence, as it is our considered opinion that such a change in this area of the law should emanate from the General Assembly. In so deferring to legislative judgment, we find that we are not alone." *Baab v. Shockling* (1980), 61 Ohio St. 2d 55, 57, 399 N.E.2d 87, 88.
>
> "We should recognize that, although courts, at times, in arriving at decisions have taken into consideration social needs and policy, it is the paramount role of the legislature as a coordinate branch of our government to meet the needs and demands of changing times and legislate accordingly." *Bissen v. Fujii* (1970), 51 Haw. 636, 638, 466 P.2d 429, 431.
>
> "[W]here the change is of such far-reaching effect as the adoption of a comparative-negligence rule which would take the place of the rule of contributory negligence which has been followed in North Dakota since before statehood, we believe that it would be desirable that such change should be made by the Legislative Assembly, and not by the courts." *Krise v. Gillund* (N.D. 1971), 184 N.W.2d 405, 409.

The fact that our legislature has indicated its approval of the contributory negligence rule is, it seems to me, demonstrated by its incorporation of that rule in numerous statutes. (See, *e.g.*, Ill. Rev. Stat. 1979, ch. 24, pars. 1—4—4, 1—4—5, 1—4—6; ch. 34, par. 301.1; ch. 121, pars. 385, 386.) The majority chooses to characterize this

action as conformance to existing law, ignoring the fact that the legislature was under no obligation to conform if it preferred otherwise.

It is to me anomalous for the majority to cite the introduction, consideration, and rejection of six bills in the legislature in less than five years as support for the proposition that there has been legislative "inaction" on the subject. (85 Ill. 2d at 22.) Rather, it seems to me, the introduction of so many bills indicates a considerable amount of activity, and an additional bill, House Bill 0142, providing a system of comparative negligence, is presently pending. The General Assembly has been well aware from our annual reports to it that the large majority of the judges of Illinois were in favor of legislative adoption of some form of comparative negligence. There is no reason to believe, as the majority suggests, that the absence of legislation doing so should now be viewed as indicating the legislature is awaiting action by this court. Rather, I would have thought the substantial volume of proposed legislation on the subject which had failed to pass indicated the General Assembly's considered judgment that no change should be made. If that assumption is correct, my colleagues are simply overruling the judgment of the members of our General Assembly on a major question of public policy because they "believe that the concept of comparative negligence which produces a more just and socially desirable distribution of loss is demanded by today's society" (85 Ill. 2d at 17) and "it is the imperative duty of the court to repair that injustice [contributory negligence], and reform the law to be responsive to the demands of society" (85 Ill. 2d at 23-24). I would respectfully suggest that the 236 members of the General Assembly are far better situated than the members of this court to determine what is "socially desirable" and to gauge the "demands of society." In a republic in which law-making power is vested, at least theoretically, in our elected

representatives, I would have thought a greater degree of judicial self-restraint desirable. (*Kelsay v. Motorola* (1978), 74 Ill. 2d 172, 190 (Underwood, J., concurring in part and dissenting in part).) The willingness of the judiciary to invade the legislative realm simply encourages additional resort to the courts for resolution of difficult questions of public policy better left to the legislative branch. Beer, *On Behalf of Judicial Restraint,* 15 Trial 37-39 (Apr. 1979); Deukmejian & Thompson, *All Sail and No Anchor—Judicial Review Under the California Constitution,* 6 Hastings Const. L.Q. 975-1010 (1979); Fernandez, *Custom and the Common Law: Judicial Restraint and Lawmaking by Courts,* 11 Sw. U.L. Rev. 1237-93 (1979).

While I do not, of course, suggest that rules of law should be immune to judicial improvement, I would, as we did in *Maki,* leave the question of change and its nature to the General Assembly in a situation as complex as this. *Maki v. Frelk* (1968), 40 Ill. 2d 193.

MR. JUSTICE RYAN, also dissenting:

I join in the dissent of Mr. Justice Underwood. However, I wish to add a few observations, realizing that some of them may be simply saying in another way that which has already been stated.

Although not necessary to this dissent, I wish to state that I do not completely agree with the majority opinion's conclusion concerning the development of the doctrine of contributory negligence and comparative negligence in Illinois. Nor do I believe that the cases cited demonstrate that this State was, in the past, a jurisdiction which followed the comparative negligence doctrine. Instead, I view the Illinois cases cited, wherein references are made to "gross" negligence or "slight" negligence and similar statements, as formulating, through common evolutions, the concept that contributory negligence is not a defense to wilful and wanton misconduct.

It is not my intention to herein debate the relative merits of comparative negligence as against contributory negligence. As Mr. Justice Underwood has stated, and as I later state herein, that is a question which the legislature should resolve. It is interesting to note, however, that comparative negligence has not received universal acceptance. There are apparently 14 States that have resisted the pressure to adopt this doctrine, including the legislature of this State in the 12 years since *Maki v. Frelk* (1968), 40 Ill. 2d 193. It also appears that comparative negligence has not always been considered to be as desirable as the majority opinion indicates it now is. Recently, in some recreational reading, the following statement was found. It was made by John W. Davis, a former member of Congress, a former solicitor general of the United States, an attorney who argued 140 cases before the United States Supreme Court, and the Democratic candidate for President of the United States in 1924. In discussing the Federal Employers' Liability Act (cited in the majority opinion as being a statute which adopted comparative negligence), Davis stated: "The Act *** destroys contributory negligence as a defense [and] restores the doctrine of comparative negligence long since repudiated by the courts *** ." (Harbaugh, Lawyer's Lawyer, The Life of John W. Davis 62-63 (Oxford University Press 1973).) Since comparative negligence has enjoyed such a vacillating acceptance, one can only wonder if this court will again be called upon at some time in the future to change the "judge-made law" we create today.

For the sake of stability, if for no other reason, it would appear preferable to have such a radical change as this made by the legislature. This court in *Maki* recognized that a substantial body of law has developed incorporating the doctrine of contributory negligence and that the legislature was in a manifestly better position to consider the numerous problems involved in a departure from that

doctrine. Now, just 12 years later, with only two members of the *Maki* court still serving, this court has reversed itself and has held that this court and not the legislature should reject contributory negligence in favor of comparative negligence. Conceivably in a few years, when the present members of this court will no longer be serving and when their replacements may be less enthusiastic about comparative negligence, this court could reject the judge-made law of this case. If we were to adhere to the holding of *Maki* and accept the action or inaction of the legislature, as the case may be, as the policy of this State, the law would be free from this possible uncertainty and we would either follow the doctrine of contributory negligence or comparative negligence free from judicial tinkering.

I am bothered by the idea that no more than four individuals, four members of this court (five members have joined in the majority in this case), can radically change the fabric of the law that will hereafter govern the conduct of the 11 million residents of this State. I am bothered by the fact that this court has snatched the problem from the hands of the 236 elected representatives of those 11 million people and has decreed that it, not the elected representatives, shall determine whether this State will follow comparative negligence and whether it will be the "pure" or "modified" form. I am particularly disturbed that this court could do this after having held in *Maki* that any change in this area should be made by the legislature and after the proponents of comparative negligence have, on at least six occasions since *Maki*, been unable to convince a majority of the elected representatives of the People of the merit of the proposition. I am not only disturbed but offended by the idea that the proponents of comparative negligence, not being able after six tries to convince the representatives of the People, should decide that it would be easier to persuade the majority of this

seven-member court, which represents no constituency.

This court must not assume the role of a super general assembly which can be called into session to enact a rule of law whenever the proponents of that rule are unable to secure its passage in the proper forum. This court has not been favored with an omnipotence not possessed by this State's coequal branches of government. Nor should we, as a court, consider ourselves to be more profound or more perceptive with regard to the needs of the citizens of this State than is the legislature. "The power of the courts is great indeed, but it is not a power to be construed with evangelic illusions of legislative or political primacy. If this is true, then the self-restraint by the courts in lawmaking must be their greatest contribution to the democratic society." C. Britell, *The Lawmakers*, 65 Colum. L. Rev. 749, 777 (1965).

Although it may be true that the doctrine of contributory negligence developed through judicial decisions, as noted in *Maki* and in the majority opinion here, in the years since the adoption of this doctrine a considerable amount of legislatively created law incorporated and relied on the doctrine of contributory negligence. Thus, with these legislative enactments woven into the fabric of a doctrine created by judicial decisions, I do not agree that this court is at liberty to excise from the fabric that portion thereof which has been judicially created, leaving the remnants of legislatively created law intact. Today's decision, of course, can have no effect on those legislative enactments which have incorporated contributory negligence, nor will the law announced today have any effect on those statutes where contributory negligence is not a defense. It appears that this State will be operating under the doctrine of contributory negligence in the areas where the legislature has acted, and under the doctrine of pure comparative negligence in common law negligence cases. Besides being confusing and difficult to apply, will

not the existence of these two doctrines create equal protection problems similar to those considered in *Harvey v. Clyde Park District* (1964), 32 Ill. 2d 60, and *Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179? In those cases the equal protection violations were the result of legislative action. Equal protection requirements, however, apply as well to judicially made law. (See 16A Am. Jur. 2d *Constitutional Law* sec. 798 (1979); 16A C.J.S. *Constitutional Law* sec. 505 (1956).) It seems to me that the problems created could be resolved if we would have adhered to the holding of *Maki*, which recognized that the legislature is in a manifestly better position to deal with the many questions involved in such a drastic change than is this court. My opposition to the majority opinion does not stem from my firm belief that judges should not participate in the law-making process. I do not oppose judicial participation in this area in proper cases. This is demonstrated by the fact that I authored the opinion in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, and joined in the opinions in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, *Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, and *Robinson v. International Harvester Co.* (1977), 70 Ill. 2d 47.

Earlier I stated I did not intend to debate the relative merits of comparative negligence as against contributory negligence. I do, however, wish to explore the nature of comparative negligence.

Contributory negligence is, of course, based upon the fault concept of tort law. Comparative negligence, while ostensibly involving the fault concept, is, in reality, a product of that school of tort law which has held that it was unjust for one who is injured not to be compensated for his loss. This is particularly true of "pure," as compared with "modified," comparative negligence. Thus the focus of pure comparative negligence is on compensation and the distribution of the loss and retains only a sem-

blance of the fault basis as a means of accomplishing its main purpose. In other words, in my opinion, pure comparative negligence is another fiction in the law which those who refuse to accept the no-fault theory of recovery have promoted to accomplish essentially no-fault recovery.

The history of the popularity of comparative negligence indicates that between 1908 and 1941 various statutory modifications of contributory negligence were passed by Congress and by a few State legislatures. Also during that period a few States enacted general comparative negligence statutes. From 1941 to 1970 there was little activity by either the courts or legislative bodies promoting comparative negligence. During this period the writers on the subject, while supporting the principles of comparative negligence, acknowledged the problems attendant to its implementation. (See W. Prosser, *Comparative Negligence*, 51 Mich. L. Rev. 465 (1953).) It was not until the early 1970's that interest was again evidenced in comparative negligence, when 13 States adopted the doctrine by legislation between 1971 and 1973. Coincidentally, at about this same time, academicians had mounted an attack against the negligence theory of recovery and had suggested alternatives to the common law fault standard of tort liability. (See O'Connell, *Expanding No Fault Beyond Auto Insurance: Some Proposals,* 59 Va. L. Rev. 749 (1973).) It has been suggested that the rush to embrace comparative negligence in the early 1970's may be seen as an effort to preserve the negligence theory against the prospective competition of no-fault theories. See G.P. White, Tort Law in America 164-68 (1980).

I have heretofore, on at least two occasions, deplored the use of legal fictions to enable injured persons to recover under a negligence theory when in fact the fiction employed permits recovery on a no-fault basis. See *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348,

379-81 (Ryan, J., dissenting); *Spidle v. Steward* (1980), 79 Ill. 2d 1, 25 (Ryan, J., dissenting in part).

Statutory remedies permitting recovery without fault traditionally have required a *quid pro quo* for the right to recover free from defenses available to a defendant under the common law. The *quid pro quo* in many statutes, such as the Worker's Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*), is a limitation on the amount that may be recovered. (See *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 327.) Under pure comparative negligence, as adopted by the majority, the injured plaintiff will have the best of both worlds. He will be able to recover for his injuries without fault and at the same time not be limited in the amount he may recover.

To say that a jury will discount a plaintiff's recovery by his degree of negligence is not realistic. Just as sympathetic juries operating under limitations of contributory negligence apply a form of comparative negligence, juries operating under pure comparative negligence will, in effect, compensate a plaintiff for his injuries, regardless of the degree of his fault.

Again I urge the legislature, as I did in *Renslow* and in *Spidle,* to review the entire negligence tort field and either out and out adopt a no-fault theory or retain the fault concept and adopt a modified no-fault theory for those who are injured as a result of their own negligence or who cannot recover because of some defense available under the common law. To me, there is something basically false about devising fictions to permit recovery under a negligence theory when, in fact, recovery is had under the principle of no fault. I am sure that these fictions will in the future be viewed with the same degree of derision with which we now view the fictions developed in the Middle Ages to circumvent the strictures of the law, both civil

and criminal, of that time.

For these reasons I must dissent from the opinion of the court.

Dissenting Opinion Upon Denial of Rehearing

MR. JUSTICE RYAN, dissenting:

Following the filing of the original opinion in this case, there was considerable confusion among the members of the bar and the judiciary as to the applicability of its holding. The majority has attempted to clarify this problem by modifying the opinion on denial of rehearing.

After having operated under the contributory negligence doctrine for 100 years, I fail to understand the rush to apply pure comparative negligence. It would seem only fair and equitable to apply this judge-made law prospectively to causes of action arising after the issuance of the mandate in this case, June 8, 1981, as this court did in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, *Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, *Robinson v. International Harvester Co.* (1977), 70 Ill. 2d 47, *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, and *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11.

To attempt to apply the holding of this case other than purely prospectively can only lead to harsh and inequitable results. A seriously injured but contributorially negligent plaintiff whose case was filed in a county with a fairly current calendar may have been denied recovery or, in evaluating his case, may have accepted nominal settlement, relying upon the contributory negligence doctrine. However, an equally seriously injured and equally contributorially negligent plaintiff who was injured at an earlier date, but whose case was filed in a county with a backlog of personal injury cases, and whose case was not called for trial before June 8, 1981, can now amend his complaint and recover under the pure comparative negligence

doctrine. Also, defendants, in evaluating their exposure to liability in accidents which happened before the decision in this case, did so on the basis of the contributory negligence doctrine. Now they are exposed to liability in those same cases to which they had not been previously exposed.

The opinion also states that the holding of this case does not apply to any case in which trial was commenced before June 8, 1981, "except that if any judgment be reversed on appeal for other reasons, this opinion shall be applicable to any retrial." (85 Ill. 2d at 28.) I do not understand the equity in permitting a person, on retrial, to allege comparative negligence a year or two hence, when a person who went to trial a week or two ago could not rely upon the holding in this case.

The above are only a few of the many potential inequities that will arise by the majority's application of the holding of this case. After having operated under contributory negligence for so long, it would not appear to severely jeopardize our system of jurisprudence to apply comparative negligence only to injuries received after June 8, 1981. All those who received injuries before that date would then receive equal treatment. Some would not be disadvantaged because their attorneys were not dilatory or the courts wherein their cases were filed operated more efficiently in disposing of personal injury cases. Also, some would not receive favored treatment simply because their cases were fortuitously reversed on appeal and remanded for new trials.

MR. JUSTICE UNDERWOOD joins in this dissent.