VERA VAZIRZADEH, Adm'r of the Estate of Radoslav Jakovljevic, Deceased, Plaintiff-Appellant, v. ROBERT S. KAMINSKI, Defendant-Appellee.

First District (5th Division)   No. 84—0476

Opinion filed June 26, 1987.

Levine, Sorkin & Nusbaum, of Chicago (Herzl E. Levine and Carl Nusbaum, of counsel), for appellant.

Cassiday, Schade & Gloor, of Chicago, for appellee.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiff, Vera Vazirzadeh, administrator of the estate of Radoslav Jakovljevic, brought an action pursuant to the Wrongful Death Act

(Ill. Rev. Stat. 1983, ch. 70, par. 1) to recover damages arising out of the death of Radoslav Jakovljevic occasioned by the alleged negligence of the defendant, Robert Kaminski, M.D., in the medical treatment of the decedent. Following a jury verdict, the entry of a judgment for the defendant and the denial of plaintiff's post-trial motion, plaintiff appeals, contending that the trial court erred (1) in admitting into evidence the defendant's testimony of a conversation between the defendant and the decedent; (2) in admitting into evidence the defendant's testimony of a conversation between the defendant and an unidentified nurse; (3) in refusing to bar or limit the testimony of a defense expert witness who was tendered for the first time after the plaintiff's case in chief; and (4) the verdict was against the manifest weight of the evidence.

On June 8, 1977, Radoslav Jakovljevic entered McNeal Memorial Hospital where he underwent knee surgery the following day. On June 15, 1977, he expired as a result of a pulmonary embolism. The plaintiff alleged that the defendant, Robert S. Kaminski, M.D., was negligent in that he failed to properly diagnose and treat post-operative symptoms of elevated temperature, rapid heart rate, shortness of breath and chest pain and that said failure was inconsistent with the established standard of care for a physician in the Chicago area in 1977.

The patient's symptoms were not disputed by the parties. The patient's chart showed entries by nurses on the evening of June 13, 1977, regarding his shortness of breath and chest pain. The entries stated that the pain was of short duration. The chart also indicated that the patient had an irregular pulse and shortness of breath on the morning of June 14, 1977.

The plaintiff called the defendant, Dr. Kaminski, to testify. Dr. Kaminski had seen the patient early in the afternoon of June 14, 1977. He noted the patient's shortness of breath and rapid heart rate on the chart. He wrote orders for two blood cultures, "stat," chest X ray and EKG, "today," intravenous antibiotics and "have Dr. Couropmitree," an internist, "see patient in consult." Dr. Kaminski testified that although the written order for the consultation did not contain the words "stat" or "today," he told an unidentified nurse to have Dr. Couropmitree see the patient "today." The plaintiff's objection to this testimony as being hearsay and without the proper foundation was overruled.

Dr. Kaminski further testified that he asked the decedent about the chest pain when he saw him that afternoon and that the decedent told him the pain was of short duration, was relieved by belching and

was not significant. The plaintiff's objection that this testimony was incompetent under the Dead Man's Act (Ill. Rev. Stat. 1983, ch. 110, par. 8—201) was also overruled. Neither this alleged conversation between Dr. Kaminski and the decedent nor an evaluation of the decedent's chest pain was included in Dr. Kaminski's progress notes on the decedent's chart.

Dr. Kaminski testified that he considered the possibility of a pulmonary embolism on June 14, 1977, but thought knee infection and septicemia to be more likely diagnoses. He agreed that the demonstrated symptoms were all signs of pulmonary embolism and that he could have given the patient heparin prophylactically until such time as an embolism could have been ruled out. He instead ordered a consultation because of his concerns about septicemia or possible pulmonary or cardiac complications.

The plaintiff next called Nurse Salud, who testified that if a physician gave a verbal order which changed a written order from an unspecified time to "today" or "stat" it was the custom of the nurses to enter that change on the chart. She stated she called Dr. Couropmitree at 10 o'clock the evening of June 14, 1977.

Dr. Charles Rice, director of intensive care at Michael Reese Hospital, testified for the plaintiff as an expert witness. He explained that when a tourniquet is applied to a leg, as in surgery, venous stasis (sluggish blood flow in the veins) can occur. This can lead to a clot in the vein which becomes a pulmonary embolism if it breaks loose and travels to the lungs. This is a well-known complication of lower limb surgery. He described the symptoms, all of which were consistent with those observed in the patient, and explained that they can be of short duration or sporadic. If a physician even remotely suspected a pulmonary embolism, heparin should have been started. Had heparin been administered when the defendant saw the decedent on the afternoon of June 14, 1977, the patient would have had a 93% chance of survival. Dr. Rice testified that in his opinion the patient received substandard care.

The plaintiff called Dr. Saul Haskell, an orthopedic surgeon, whose testimony was similar to the testimony of Dr. Rice.

The plaintiff rested her case in chief on Thursday, December 1, 1983. Friday morning defendant's attorney informed plaintiff's attorney that he had an additional expert witness, Dr. Westenfelder, an internist with an infectious disease subspecialty. Plaintiff's attorney presented a motion to bar the testimony of Dr. Westenfelder. Plaintiff's attorney alleged that in response to his notice to produce the names of the defendant's expert witnesses before the start of the trial, coun-

sel for the defendant had given only the name Dr. James Ahstrom. The defendant's counsel had mentioned Dr. Westenfelder to plaintiff's attorney but stated that he did not know whether he would call him as a witness because the doctor was out of town and they had not conferred. At that time the plaintiff's attorney was told by the defendant's attorney that if he called Dr. Westenfelder as a witness it would be only for the purpose of supporting the defendant's diagnosis of the decedent's infection and septicemia. Plaintiff's attorney became aware for the first time on Friday, December 2, 1983, that Dr. Westenfelder would be called by defendant to testify to additional matters. When the trial court refused to bar Dr. Westenfelder's testimony, plaintiff's counsel requested that his testimony be limited to the issue of infection. The court denied the request.

Plaintiff's attorney deposed Dr. Westenfelder on Saturday, December 3, 1983. Dr. Westenfelder testified the following Monday morning. In his testimony he made repeated references to the standard of care of the "non-internist." The standard was, in his opinion, lower than that of an internist and the defendant, he felt, acted in accordance with that standard. He was of the further opinion that the defendant's diagnosis of knee infection was a reasonable diagnosis for a non-internist.

Dr. Westenfelder testified that he reviewed the case for the defendant on June 14, 1982. He wrote a letter very critical of Dr. Kaminski at that time which indicated that the treatment given the patient by the defendant showed a lack of concern. Plaintiff's counsel was not aware of this letter when he presented his case to the jury. He was not made aware of this letter until he moved to bar Dr. Westenfelder's testimony, a year and a half after the letter was written.

Dr. Westenfelder testified that he was under the wrong impression when he wrote the letter. After having read the nurses' depositions, he now blamed them for not keeping Dr. Kaminski informed, not executing his orders in a timely fashion and not communicating with each other.

Dr. Ahstrom, an orthopedic surgeon, was also called as a defense witness. He testified that if Dr. Kaminski indeed ordered the consultation for that day it was within the accepted standard of care.

Dr. Couropmitree, a defense witness, testified that when he was called on the night of June 14, 1977, he was not told of the decedent's shortness of breath or irregular heart rate. Had he been informed, he would have at least sent a resident physician to see the decedent. He stated that the order for consultation written by Dr. Kaminski was a routine order.

Dr. Kaminski then returned to the stand to testify in his own behalf. He explained why he made the diagnosis. He testified that he knew Dr. Couropmitree's habit of making rounds in the afternoon and fully expected him to see the decedent that day although he did not qualify his written order with "stat" or "today." He asserted that when the time frame is not indicated on the chart, a nurse will ask how soon.

The defense rested. The jury returned a verdict of not guilty, upon which judgment was entered. Plaintiff's motion for a new trial, which alleged that the verdict for the defendant was not supported by a preponderance of the evidence, was heard and denied.

It was established by the plaintiff and undisputed by the defendant that chest pain is a primary symptom of a pulmonary embolism. The justification Dr. Kaminski gave for ignoring this symptom was his belief that it was insignificant. The effect of the words allegedly spoken by the decedent to the defendant would have been to minimize the significance of the pain. Defendant's testimony of this conversation with the decedent was therefore extremely supportive of the defense and, with no other witnesses to it, impossible to refute.

■ In arguing that this conversation between the defendant and the decedent should have been excluded, the plaintiff relied on the Dead Man's Act (Ill. Rev. Stat. 1983, ch. 110, par. 8—201):

> "In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, except in the following instances: (a) If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event."

The defendant's attorney argued that the conversation came within exception (a) of the statute in that the plaintiff had opened the door to the admission of the conversation when the decedent's wife testified that the decedent complained of pain and the defendant was questioned about that symptom. Counsel for the defendant further contended that the entire hospitalization was the "event" within the meaning of the statute, or, more narrowly, that the chest pain of June

13, 1977, was surely an "event."

The defendant relied on *Perkins v. Brown* (1948), 400 Ill. 490, 497, 81 N.E.2d 207, in which the decedent's heirs brought an action to set aside a deed which conveyed property from the decedent to the defendants. The heirs called a defendant as an adverse witness and questioned him about the transfer of the deed. In holding that the defendant could thereafter testify in his own behalf concerning the transfer, the supreme court stated:

> "The rule is that where a party, who is incompetent to testify for himself as to a transaction, is called by the adverse party and questioned concerning the same, he is thereby made competent to testify in his own behalf as to the whole of such transaction, although his incompetency is not removed as to other matters about which he was not interrogated by the adverse party." 400 Ill. 490, 497, 81 N.E.2d 207.

The trial court accepted the *Perkins* rationale in overruling the plaintiff's motion to exclude Dr. Kaminski's testimony. In so doing the court erred.

*Perkins* states that "incompetency is not removed as to other matters about which he [the defendant] was not interrogated by the adverse party." The plaintiff's attorney at no time asked Dr. Kaminski to relate his conversation with the decedent. That the decedent's wife testified to a conversation between herself and her late husband did not qualify the defendant to testify about a conversation he had with the decedent. Defendant was not questioned about the conversation between the decedent and his wife. Similarly, testimony by the nurses about conversations with the decedent would not cause Dr. Kaminski's conversation with the decedent to become admissible.

*Perkins* is also inapplicable because it interpreted the prior Dead Man's Act, the language of which is materially different from that of the present statute. (*Manning v. Mock* (1983), 119 Ill. App. 3d 788, 457 N.E.2d 447.) The *Perkins* court determined what constituted a "transaction" within the meaning of the old statute. In the current statute the term "transaction" has been replaced by the word "event." Presumably the legislature intended to change the scope of the statute when it changed this language.

■■ In *Mock*, the action was to invalidate a will. One of plaintiff's theories was that Mock exerted undue influence on the testatrix. At trial the plaintiffs called as witnesses the attorney who drafted the will and a witness to the execution of the will. Mock sought to testify to conversations he had with the testatrix during a six-week period prior to the signing of the will. He contended that the testimony of

plaintiff's witnesses opened the door for him to testify fully to his participation in the will's preparation under exception (a) to the Dead Man's Act and that his conversations were an integral part of the event. The plaintiffs did not dispute that they opened the door concerning the "event" but asserted that the word "event" must have a logical limitation as to time and place. The trial court interpreted the event to be only the act of the execution of the will to which the witnesses testified, not the total event of all actions leading up to the will's preparation. The trial court sustained the plaintiffs' objection and the appellate court found no error. "The purpose of all statutory construction is to give effect to the legislature's intent by examining the language employed by the statute, giving it its plain and ordinary meaning, and also by looking to the necessity for the law, the evil sought to be remedied, and the object sought to be attained." (119 Ill. App. 3d 788, 799, 457 N.E.2d 447.) The ordinary meaning of the word "event" is a "happening or occurrence," and "conversation" is defined as "the act or instance of talking together; *** the verbal exchange of ideas, opinions, etc." (Webster's New World Dictionary 485, 310 (2d College ed. 1986).) The statute specifically refers to conversations *or* events. Since we would choose not to find redundancy in our laws, we assume that the legislature intended to make a distinction between verbal exchanges and other types of activity and considered conversations to be entities separate from the events surrounding them.

■ The accepted objective sought to be attained by the Dead Man's Act is fairness. The interested party, in this case Dr. Kaminski, is barred from testifying to, but only to, matters which the deceased could have refuted. (See *Foster v. Englewood Hospital Association* (1974), 19 Ill. App. 3d 1055, 313 N.E.2d 255.) Only unwitnessed conversations with the decedent are off limits. Nothing in the record can be construed to have opened the door to the defendant's testimony regarding his discussion with his deceased patient and we find the court erred in admitting the conversation.

A conversation with a patient regarding symptoms, treatment, etc., or the relevant conclusions resulting therefrom, can be noted on the patient's chart. The more complete the patient's records, the better informed is the medical staff and the higher the standard of care is likely to be. That medical records are admissible under the rules controlling the admission of business records is but an extrinsic benefit.

■ The parties are agreed that there are five factors to consider in determining whether the testimony of an undisclosed witness

should be excluded: (1) the surprise of the adverse party; (2) the prejudicial effect of the testimony; (3) the diligence of the adverse party; (4) the timely objection to the testimony; and (5) the good faith of the party calling the witness. *People ex rel. Ashford v. Ziemann* (1982), 110 Ill. App. 3d 34, 41, 441 N.E.2d 1255.

Plaintiff argues that defense attorney's supposed good-faith compliance with the discovery rules is highly suspect. Although the defendant's attorney early informed plaintiff's attorney that Dr. Westenfelder had reviewed the decedent's file, defendant's attorney also told plaintiff's attorney that he did not think he would call him as a witness—a reasonable conclusion in light of Dr. Westenfelder's negative report and a conclusion upon which plaintiff's attorney relied. The problem arose when defense counsel resubmitted reports and nurses' transcripts to the doctor on November 19, 1977, and not only failed to inform plaintiff's counsel, but in response to a direct request of plaintiff's counsel for names of additional witnesses, the defendant's attorney told him that Dr. Westenfelder was out of town and could not be reached, a technically true but misleading response. We defer to the trial judge's refusal to find bad faith. He was in a far better position to evaluate the words and actions of those appearing before him.

There is no argument that the objection to Dr. Westenfelder's testimony was not timely made. Attorney for the plaintiff objected as soon as he became aware of the defense counsel's intent. As to the diligence of the plaintiff's attorney, he had submitted a Supreme Court Rule 237 notice and had been told that Dr. Westenfelder probably would not be called as a witness, but if called he would only testify in support of Dr. Kaminski's diagnosis of infection and septicemia. As late as November 28, 1983, in a meeting held in chambers with the trial judge, plaintiff's attorney was told again, in response to his request for additional names of experts, that defense counsel thought that he would not put Dr. Westenfelder on the stand. In light of these circumstances no fault can be found in the failure of plaintiff's attorney to depose the doctor before trial.

The issues of surprise and prejudicial effect can be considered together. When defense counsel repeatedly indicated that he did not think he would call Dr. Westenfelder, as late as three days before he was to present his case and long after depositions of the plaintiff's witnesses had been taken, it was reasonable for plaintiff's attorney to assume that Dr. Westenfelder would not be called. Plaintiff's case was planned and presented with a format keyed to the issues as determined by the normal process of discovery. It was only after the plain-

tiff's case had been completed that plaintiff's counsel was made aware that Dr. Westenfelder would testify. Had defense counsel informed plaintiff's attorney that additional information had been sent to Dr. Westenfelder for his analysis, then plaintiff's attorney could have had experts prepared to testify on the newly raised issues and standing by in the event their testimony was needed.

Although the calling of Dr. Westenfelder as a witness was a surprise, his testimony may not have been so prejudicial as to mandate a reversal had the doctor testified to the materials and issues raised by the other experts, as it was originally suggested he would do. Instead, however, Dr. Westenfelder's testimony introduced the totally new concept of a "non-internist" and implied that a different standard of care was expected of such a physician. Later in his testimony Dr. Westenfelder suggested the decedent's death was attributed to either the nurses or Dr. Couropmitree, who were nonparties to this action.

Dr. Westenfelder's testimony was highly prejudicial to the plaintiff's case. It was totally unanticipated and violative of the spirit of discovery. "[T]he purpose of the discovery rules [is] to enable attorneys to better prepare and evaluate their cases. *** '[A]scertainment of truth and ultimate disposition of the lawsuit' [are] better served when parties are well educated as to their respective claims in advance of trial." *Carlson v. General Motors Corp.* (1972), 9 Ill. App. 3d 606, 619, 289 N.E.2d 439.

The defendant cites *Plost v. Louis A. Weiss Memorial Hospital* (1978), 62 Ill. App. 3d 253, 378 N.E.2d 1176, as authority for allowing Dr. Westenfelder's testimony. In *Plost*, counsel for the plaintiff named four expert witnesses in his answers to interrogatories. Upon trial, one had died and the others were unwilling to testify. The plaintiff moved for a continuance so that he might find new experts. The trial court denied the motion and the appellate court found such denial to be an abuse of discretion.

*Plost* is distinguishable from the case at bar. In *Plost* the plaintiff's counsel had complied with all discovery rules. It was his intention to call those witnesses he had disclosed. It was through no fault of his own that those witnesses became unavailable and it was of a very real necessity that he have expert testimony. The court stated that where the identity of an expert witness is first revealed during trial, trial may be delayed to allow opposing counsel to depose the witness, so there is no reason to limit a party to those experts listed in answers to interrogatories.

The defendant's attorney did not belatedly find himself without an expert witness, and Dr. Westenfelder was not revealed during the

trial proceedings, but rather years before trial was commenced. In *Plost*, the plaintiff sought to find new experts before the trial began. Here, defense counsel sought to add an expert witness to testify to new matters after plaintiff had presented his entire case.

Being allowed to depose Dr. Westenfelder two days before he was to take the stand and after the conclusion of the plaintiff's case in chief could hardly compare with being informed prior to trial. The trial court was willing to allow plaintiff's counsel a few days—perhaps until as late as Wednesday—to find rebuttal witnesses. Plaintiff's counsel stated that he would be unable to have his experts return and that he had no others readily available to him.

The trial court suggested he could subpoena experts. The court stated in *Plost* that the wisdom of that tactic is questionable:

"Proceeding to trial with an expert who is reluctant to testify and who has been subpoenaed in the hope he will shed favorable light on the case is also dangerous to successful litigation. It is doubtful such an unwilling witness would be desirous of aiding the litigant who has caused his inconvenience." *Plost v. Louis A. Weiss Memorial Hospital* (1972), 62 Ill. App. 3d 253, 258, 378 N.E.2d 1176.

To combat the defense that the nurses or Dr. Couropmitree were at fault in the decedent's death would have required a different approach than that presented in the plaintiff's case in chief. Plaintiff's attorney was thrust into the position of trying to defend persons who were not parties to the action. This was an undue burden. The trial court abused its discretion in allowing Dr. Westenfelder's testimony.

■ Plaintiff contends that based upon a lack of proper foundation it was error to allow the defendant, Dr. Kaminski, to testify to a conversation he allegedly had with an unidentified nurse. We agree.

Dr. Kaminski testified that the conversation took place on June 14, 1977, at approximately 1:30 p.m. in the nurses' station. Dr. Kaminski failed to identify to whom he spoke. Upon objection by plaintiff's attorney Dr. Kaminski stated that he could not remember which nurse it was. The court, in overruling the objection, observed that the defendant had "done his best."

In *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 235 N.E.2d 671, a malpractice action, the plaintiff was precluded from testifying that he made certain complaints to the nurses since there was no attempt to lay a proper foundation for its admission. No effort was made to establish when, where or who was present when the complaints were made.

In this case it appears that the defendant made no effort to dis-

cover the name of the nurse to whom he says he spoke. It also appears that there were payroll or personnel records as well as records or schedules from the particular nurses' station which the defendant could have consulted to find the nurse's identity. Defense counsel's brief in this court states, "[t]he plaintiff had ample opportunity to identify every nurse on duty on June 14." The defendant was equally able to obtain this information. Dr. Kaminski's written order did not give a time frame for notifying Dr. Couropmitree. His testimony that he gave a verbal order that the consultation be "today" was in direct contradiction to what is evidenced in the patient's record. If indeed such a conversation did take place, it was incumbent upon Dr. Kaminski to establish to whom he spoke.

In view of our finding of error with respect to the issues presented above, we do not consider to what degree the verdict was supported by the evidence.

Reversed and remanded.

SULLIVAN, P.J., and LORENZ, J., concur.