AH SING HAIST, Special Adm'r of the Estate of Yen Yen Wang, Deceased, Plaintiff-Appellant and Cross-Appellee, v. WEI WU, Defendant-Appellee and Cross-Appellant.

First District (5th Division)   No. 1—90—0716

Opinion filed September 4, 1992.

Sorkin & Nusbaum, of Chicago (Carl Nusbaum, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (R. Dennis Rasor, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court.

This action was brought under the Wrongful Death Act (Ill. Rev. Stat. 1981, ch. 70, pars. 1, 2), to recover damages for the death of Yen Yen Wang allegedly caused by the negligence of the defendant Dr. Wei Wu in his treatment of the decedent. The jury returned a verdict in favor of the plaintiff and against the defendant, but awarded zero damages. Both parties have appealed. For the reasons set forth below, we affirm.

FACTS

In April of 1982, the decedent Yen Yen Wang came to the United States from her native Taiwan. About a month later, she was joined by her husband, Chung Gie Wang. Neither Yen Yen nor Chung Gie

spoke English. They lived for a time in Rome, Georgia, and in October 1982 moved to Wheeling, Illinois.

Chung Gie was employed at a restaurant in Wheeling owned by Eugene and Sue Wang (no family relation). Chung Gie and Yen Yen resided in a rental apartment in Wheeling which was within 10 minutes' walking distance from the restaurant. At the time of the occurrence at issue, their telephone had not yet been installed.

In October 1982, the decedent suspected she was pregnant. When pain and bleeding developed, she decided to seek medical help. On Tuesday, November 2, Polly Tung, who was a waitress at the restaurant where Chung Gie was employed, drove Yen Yen to the Chinatown office of the defendant, Dr. Wu, an obstetrician and gynecologist. Dr. Wu maintained another office in Woodridge, and was in the Chinatown office on Tuesday and Saturday from 3 to 6 p.m.

Dr. Wu's examination of the decedent, along with her history and symptoms, indicated either an ectopic pregnancy or a miscarriage. An ectopic, or tubal, pregnancy is a life-threatening condition since the fallopian tube can rupture at any time, causing the patient to hemorrhage. It is undisputed that Dr. Wu gave the decedent a prescription to have an ultrasound test, which was performed on Thursday, November 4, at St. Francis Hospital in Evanston. That same day, November 4, Dr. Robert Greenstein, a radiologist at St. Francis, called Dr. Wu with the ultrasound test results. The test indicated a strong possibility of an ectopic pregnancy. There is no dispute that these results were never communicated to Yen Yen or Chung Gie Wang. Neither of the doctors called them, nor did the Wangs attempt to learn the results by contacting the doctors.

On Saturday, November 6, Chung Gie received a call at work and was told that his wife had collapsed at a neighbor's apartment. Yen Yen was taken to Holy Family Hospital, where surgery was performed, but she died at 11 a.m. on Sunday, November 7, 1982.

Plaintiff brought a single-count action against Dr. Wu, alleging that defendant was negligent in failing "to follow through on the continuance of care in a more reasonable time by being too non-specific in his instructions and impressing on her the urgency of the situation." Defendant was also allegedly negligent in failing "to obtain and retain adequate information" for purposes of contacting her and failing "to promptly communicate" the fact that the ultrasound test confirmed his diagnosis of ectopic pregnancy or "to adopt emergency measures for purposes of contacting [the decedent] knowing that she had a potentially serious condition." Plaintiff's complaint further alleged that as a result of Dr. Wu's negligence, the decedent sustained a

ruptured ectopic pregnancy which caused her death. The decedent's husband, Chung Gie Wang, is her sole next of kin.

Defendant denied the allegations of the complaint, and as an affirmative defense, alleged that the decedent was contributorily negligent in failing to seek medical care for herself on November 5 and 6. Defendant also alleged that the decedent's husband was negligent in failing to seek medical care for his wife on November 6.

A jury trial was held in September 1989. Plaintiff's first witness was the defendant, Dr. Wu, called as an adverse witness. He was questioned about his office records regarding his treatment of the decedent, Yen Yen Wang. There was an address but no phone number on the decedent's record. The defendant testified that it was "impossible" that she had given him her phone number and he had failed to write it down. When asked "is it conceivable that she thought you had her phone number?" the defendant replied "That's a fact, she didn't have a phone at home." The doctor also testified "before she left, she knew she didn't give me the number." He also stated that the decedent declined to give him the number of the restaurant where her husband worked, and he did not ask her friend for a number. He said that the only way he could have had contact with her would have been by mail or by her calling him, which he maintained she promised to do.

Dr. Wu was also asked about his telephone conversation with Dr. Greenstein on November 4. Dr. Wu was at his Woodridge office when he took the call, and the decedent's records were at the Chinatown office. Dr. Wu, however, remembered that he had no phone number for the decedent, and accordingly asked Dr. Greenstein if he had the decedent's number, to which he responded that he did not. As a result, Dr. Wu waited for the decedent to call.

Dr. Wu testified that, on Saturday, November 6, he received a telephone call from Holy Family Hospital at about 7 p.m. as he was on the way home from his Chinatown office. The hospital informed him that the decedent was in surgery at the hospital. He drove to the hospital, arriving at 8:30, and gave to decedent's husband a letter written in Chinese. Dr. Wu testified that he wrote the letter on November 5. He admitted, however, that in answers to interrogatories he stated that he was in the process of writing the letter on November 6 when he received a call from Holy Family Hospital informing him that Yen Yen was in surgery there.

Prior to the cross-examination of Dr. Wu by his own counsel, a sidebar was held. Defense counsel stated that he intended to ask the witness about his conversation on November 2 with the decedent in-

cluding his unsuccessful attempt to obtain a phone number from her, questions which would ordinarily be barred by the Dead Man's Act. (Ill. Rev. Stat. 1989, ch. 110, par. 8—201.) Defense counsel argued that plaintiff had opened the door to such questions by asking whether it was "conceivable" that Yen Yen thought the doctor had her phone number so as permit questions to allow defendant to explain why he did not have the decedent's phone number. The court, over plaintiff's objection, ruled that the explanation may be elicited.

On cross-examination by his own counsel, Dr. Wu explained that in 1982, his Chinatown practice was primarily a "storefront" walk-in practice where patients would come in without an appointment. His Chinese-speaking receptionist would get the patient's name, address, birthday and telephone number, and would type that information on the patient's record.

Dr. Wu stated that based on her history and his physical examination, he believed decedent may have had a miscarriage, an incomplete abortion, or an ectopic pregnancy. The first step was to rule out ectopic pregnancy. To do that, he wanted an ultrasound test performed as soon as possible.

Over plaintiff's objection, defendant was permitted to testify that he explained to the decedent that it was possible she had an ectopic pregnancy or had suffered a miscarriage. He informed her that if it was an ectopic pregnancy, surgery would be required to remove the embryo. If it was a miscarriage, a D & C could be required.

The doctor told her that he wanted an ultrasound test performed as soon as possible, preferably at Columbus Hospital or La Grange Hospital, where Dr. Wu was a staff member. Her response was that both hospitals were at some distance from her apartment, and since she did not have a car, she would have to make arrangements for someone to drive her. Dr. Wu testified that although he tried to obtain decedent's authorization to make arrangements for the ultrasound test before she left his office, she refused, stating that she could not make a decision without first discussing it with her husband and that they would notify Dr. Wu after they had decided. Dr. Wu suggested that she call her husband right then, but she explained that her husband worked as a cook and was hard to reach and she did not want to make a quick decision over the phone.

During his conversation with the decedent, Dr. Wu learned that she did not have a home phone. He asked her for her husband's work number, which she refused to divulge, saying she would call him (Dr. Wu). She left his office with a prescription form for an ultrasound

test. Dr. Wu also gave her his business card with both the Woodridge office number and the number of his 24-hour answering service.

Over plaintiff's objection, Dr. Wu was further permitted to testify that he gave her the following advice:

"I tell her very simple, the tubal pregnancy because that the bleeding inside, that will cause pain, miscarriaging. That bleeding you can see for outside there are bleed or hemorrhage.

In both of situation, they might—you might die of the bleeding, either inside or outside. So very simple, before you have ultrasound done, in case you have abdominal pain, bleeding going or bleeding getting heavier to hemorrhaging, go to the emergency room right away. Don't wait for the ultrasound."

His office record regarding the advice he had given to Yen Yen contained only the notation "to hospital emergency room if the bleeding increase or pain worse."

At this point in the trial, plaintiff moved for a mistrial based on what he urged were cumulative and ongoing violations of the Dead Man's Act. He denied that he had opened the door to testimony regarding the content of any conversation between the decedent and Dr. Wu by asking any questions about the doctor's conversations with the deceased. Defendant's response was that plaintiff had asked many questions designed to elicit what happened during the encounter between Dr. Wu and the decedent, specifically the fact that Dr. Wu did not get a telephone number from her, implying that he never asked for one or that she gave him one which he failed to write down.

In addition, defendant noted that in his opening statement plaintiff had argued that the defendant should have impressed the urgency of the situation on the decedent and should have made her call her husband from the doctor's office. Plaintiff read from the complaint the allegation that the defendant was negligent in failing to impress the urgency of the situation on the decedent. Also, plaintiff's expert would testify that these failures were a deviation from the standard of care. As a result, defendant urged that he should be allowed to give his explanation as to what actually happened in his office on November 2. Plaintiff's motion for a mistrial was denied.

When cross-examination resumed, Dr. Wu testified that he expected her to call him and let him know when and where she was going to have the ultrasound test performed to enable him to contact the hospital which she chose to obtain the results. He did not hear from the decedent on November 3 or 4, but did get a message at his Woodridge office from Dr. Greenstein of St. Francis Hospital on the afternoon of the 4th, who informed the defendant that the ultrasound

test confirmed his diagnosis of ectopic pregnancy. Since neither Dr. Wu nor Dr. Greenstein had a phone number at which the decedent could be reached, Dr. Wu assumed she would call him or take his advice to seek emergency help if a problem occurred. He also testified that he was not certain that she was still his patient, since she might have found another doctor closer to home.

When he did not hear from the decedent on Friday the 5th, he was concerned. He wrote a letter to her in Chinese, which said "If you have seen any doctor in your neighborhood, please contact me and about a result ultrasound. And you should go to see the doctor." He did not mail the letter that evening since he did not have her address at home.

On Saturday, the 6th, when he arrived at his Chinatown office, he noted on the decedent's record the phone call he had received on the 4th from Dr. Greenstein. He wrote "Call from hospital. Ultrasound report, it's right acystic mass, possible ectopic pregnancy. No phone. Waiting for patient to call." He also made a notation for November 6: "no call, no show. Will send a letter to her."

On the way from his Chinatown office to his home in Darien, Dr. Wu's beeper was activated. When he got home, he returned the call from Holy Family Hospital and learned that Yen Yen was there and drove to the hospital.

Plaintiff's next witness was Dr. Robert Greenstein, a radiologist at St. Francis Hospital. He testified that the radiology department logbook showed that the decedent had an appointment for 2:30 p.m. on Thursday, November 4, and indicated the problem to be "fetus bleeding." The logbook also had a phone number, which, it was later revealed, was that of the decedent's friend Sue Wang, who had called to make the appointment.

The requisition form, which the patient receives from central registration and presents to the radiology technologist, indicated that the ultrasound test was performed at 1:09 on November 4. Dr. Greenstein was at lunch at that time, and when he returned the decedent had left. His analysis of the ultrasound results indicated a likely ectopic pregnancy.

Dr. Greenstein testified that he telephoned Dr. Wu and advised him that the ultrasound indicated a high possibility of an ectopic pregnancy. Dr. Wu responded that he would contact the patient and asked if Dr. Greenstein could provide him with her phone number. Dr. Greenstein answered that her telephone number was not on the requisition form which he had before him. Dr. Greenstein further testified

that the defendant had not previously advised him that he did not have a telephone number for the decedent.

Chung Gie Wang, the decedent's husband, was the next witness, testifying through an interpreter. After his wife saw the defendant on November 2, Chung Gie understood that she was to have "an x-ray" taken. He made arrangements for Sue Wang, wife of Eugene Wang, who owned the restaurant, to accompany his wife Yen Yen to have the "x-ray" taken on November 4. Chung Gie said that it was their intention to find a doctor closer to home after they knew the results of the ultrasound test.

The decedent's husband further testified that after the test, he and his wife waited for the doctor to call with the results. He testified that he told the people at work to please let him know if there was a phone call from a doctor. There was no call on November 5, and when he returned home shortly after midnight, his wife was asleep.

The morning of Saturday, November 6, he saw a big chunk of blood in the lavatory, which he thought might be a miscarriage. His wife was not feeling well when he went to work Saturday morning. His plan was to come home when he got his break about 3 that afternoon, bring home groceries which his wife had asked him to get, and pick up Dr. Wu's number and have a friend try to call the doctor. Chung Gie knew that Dr. Wu's hours were 3 to 6 on Saturday.

Before he went home, Chung Gie received a call at the restaurant that his wife had fainted in a neighbor's apartment. Eugene Wang drove him home, and the decedent, Yen Yen Wang, was taken by ambulance to Holy Family Hospital. Dr. Wu arrived at the hospital and hand delivered the letter he had written. Emergency surgery was performed, but she died the next morning.

On cross-examination Chung Gie testified that his wife was a capable woman with common sense. He said that he knew on Thursday that his wife was still bleeding, and that when he went to work on Friday, her health was "not too good." On Friday night she told him she was still in pain, and on Saturday he knew that she had lost a lot of blood. In spite of this knowledge, he did not take Dr. Wu's business card to work with him on Saturday morning. He did not attempt to call a doctor himself, nor did he ask anyone to help him make a call.

Shu (Sue) Ying Wang, Eugene's wife, testified that she made the appointment for the decedent at St. Francis Hospital and left her phone number with the hospital. Shu Wang understood that the doctor would contact them with the results of the test.

Shu Wang stopped by to see the decedent on Friday, November 5, at about 5 p.m., at which time the decedent was "very sad" and in

pain. She told Shu Wang that she had lost a lot of blood the night before.

On cross-examination, Shu Wang said that the decedent told her at that time that she thought she had suffered a miscarriage and lost the baby. The decedent did not ask Shu Wang to call the doctor or to take her to an emergency room.

Plaintiff's final witness was Dr. George Pepper, who testifed as to the required standard of care. According to Dr. Pepper, when an obstetrician/gynecologist is faced with a patient with the decedent's history and symptoms, the doctor should first consider an ectopic pregnancy, and the standard of care requires that this patient not be let out of immediate contact until that diagnosis is proven and treated or ruled out. The doctor should see to it that the patient has an ultrasound test performed immediately, and that the patient is kept at the facility where the test is performed until the doctor receives the results and communicates them to his patient. If the test confirms the ectopic pregnancy, the patient should be admitted to the hospital the same day, and emergency surgery performed that day or the next day at the latest. If the woman insists on talking with her husband, the call should be placed from the doctor's office.

It was Dr. Pepper's opinion that Dr. Wu failed to conform to the standard of care of a reasonably well-qualified obstetrician/gynecologist. He should not have let the decedent out of his office without having definite plans for her to have an ultrasound test performed that day at a specific location. He should also have called her husband and impressed upon him the urgency of the situation, and should have gotten the number of the restaurant where the decedent's husband worked, if not from the decedent then from the friend who had driven her to defendant's office.

In Dr. Pepper's opinion, Dr. Wu also failed to meet the standard of care by failing to follow through to find out when and where she was going to have the ultrasound test performed. Once Dr. Wu learned the results of the test, he should have used any means possible to reach the decedent, either by going himself to her address, or by using a messenger service or sending a courier to deliver a letter. Dr. Pepper also suggested that Dr. Wu could have called the local police.

Dr. Pepper also testified that there was a causal connection between the negligence of Dr. Wu and the decedent's death. In his opinion, even with all of the delay, the decedent's life could have been saved had she gotten help even if only six hours sooner.

On cross-examination, Dr. Pepper conceded that, if Dr. Wu advised the decedent on Tuesday, November 2, that in the event that her pain increased or that bleeding occurred that she should go to the emergency room of the nearest hospital, it would appear from the facts that she did not follow that advice. Prior to her collapse on Saturday afternoon, she must have been in severe pain and should not have ignored that pain.

Following Dr. Pepper's testimony, the plaintiff rested.

Defendant called as his first witness his expert, Dr. John Pickens. He explained that part of his practice is a "storefront practice" such as that of Dr. Wu in Chinatown. In such a practice patients are more likely to come in when there is an urgent problem, but may not continue care with that facility or physician, choosing instead to utilize some other facility or physician more conveniently located.

Dr. Pickens also testified that he was familiar with "Chinese culture and attitudes," having treated Chinese women regularly for the past 19 years. Regarding the relationship between Chinese women and their husbands and its impact upon a physician's practice, he stated:

> "With the overseas born couple, the wife depends tremendously upon the husband for decision making, and in my experience, in suggesting various treatments or tests that need to be done.
>
> I can propose the test or the treatment, I can support it with the necessary logic behind why they need to be done, but the patient will invariably have to check with her husband to get approval to proceed with whatever was suggested."

In Dr. Picken's opinion, it was not a deviation from the requisite standard of care for Dr. Wu to fail to obtain the decedent's acquiescence to an ultrasound test before she left his office on November 2. This opinion was based in part on cultural customs which required her to discuss any proposed treatment with her husband and to get his agreement. Dr. Wu did all he could do.

Dr. Pickens also testified that the standard of care did not require Dr. Wu to take extraordinary measures such as calling the police or sending a telegram or messenger to reach the decedent after he learned the results of the ultrasound test. The decedent knew that if her situation worsened, she was to go to an emergency room. In addition, it was possible that she had found another physician more accessible to her from her home. Dr. Wu understood that she would call him if she chose to continue under his care.

It was also Dr. Pickens' opinion that, based upon the extent of the decedent's pain and bleeding from Thursday night through Saturday morning, she had failed to exercise ordinary care for her own health and well-being by failing to seek medical care. Although Dr. Wu had told her to seek emergency care if her condition worsened, she failed to follow his instructions. Even if he had not given her that advice, common sense would dictate that one who is losing more blood and experiencing increasing pain would seek medical help. In addition, in Dr. Pickens' opinion the decedent's husband, Chung Gie, knowing of his wife's condition on Saturday morning when he left for work, failed to exercise ordinary care in not seeking help for her.

Sho Yuan testified that in 1982 she worked as a secretary and receptionist in Dr. Wu's Chinatown office. One of her responsibilities was to obtain information from new patients who came to the office. She would give them a piece of paper and ask them to write their name, address, birthday and phone number. If the patient did not write down a phone number, she would orally ask for it. If the patient denied having a phone, she would ask for an alternate number where the patient might be reached. If the patient said there was no other number, no further questions were asked. Sho Yuan did not specifically remember the decedent Yen Yen Wang.

The defendant also testified, this time on his own behalf, as to his background and training in obstetrics and gynecology. Following his testimony, the defense rested.

Plaintiff's motion for a directed verdict as to the alleged contributory negligence of Chung Gie Wang was denied. The court also rejected plaintiff's arguments that the alleged negligence of the decedent's husband should be considered under a comparative standard rather than as a complete bar to any recovery under a contributory standard.

By agreement, the matter was submitted to the jury under instructions which advised them if they found that both the defendant and the decedent's husband were negligent they should return a verdict in favor of the plaintiff and against the defendant but award zero damages. This is the verdict they returned. Post-trial motions were filed by both sides and were denied. Both parties have appealed.

OPINION

Plaintiff raises three issues on appeal: (1) whether the doctrine of comparative negligence is applicable to beneficiaries under the Wrongful Death Act (Ill. Rev. Stat. 1981, ch. 70, pars. 1, 2); (2) whether the trial court erred in failing to grant plaintiff's motion for a directed

verdict on the issue of the husband's contributory negligence; and (3) whether the trial court erred in allowing the defendant to testify to the content of the conversation he had with the decedent and in failing to grant the plaintiff's motion for a mistrial. Defendant, in his cross-appeal, raises a single issue, namely, whether he was entitled to a judgment *n.o.v.* where the evidence failed to establish that the decedent would have done anything different had the defendant contacted her with the results of the ultrasound, but did establish that had she followed his instructions, her death could have been prevented. We shall address the issues in the above order.

Plaintiff's first issue involves the impact of contributory negligence under the Wrongful Death Act (Ill. Rev. Stat. 1981, ch. 70, pars. 1, 2), which provides, in part:

"In any such action to recover damages where the wrongful act, neglect or default causing the death occurred on or after July 14, 1955, it shall not be a defense that the death was caused in whole or in part by the contributory negligence of one or more of the beneficiaries on behalf of whom the action is brought, but the amount of damages given shall not include any compensation with reference to the pecuniary injuries resulting from such death, to such contributorily negligent person or persons, and such contributorily negligent person or persons shall not share in any amount recovered in such action." (Ill. Rev. Stat. 1981, ch. 70, par. 2.)

It is plaintiff's position that the negligence of a beneficiary should not bar his recovery entirely, but rather should merely reduce his recovery according to comparative negligence principles. To achieve this result, plaintiff urges that we look to the legislative intent in enacting the above-quoted provision in 1955.

Prior to 1955, the contributory negligence of one beneficiary would bar recovery by all beneficiaries. (See *Hazel v. Hoopeston-Danville Motor Bus Co.* (1923), 310 Ill. 38, 49, 141 N.E. 392 ("the contributory negligence of one beneficiary who may be entitled to share in the amount recovered is a defense to the action").) This rule was based upon the theory that the judgment in a wrongful death action was a single indivisible judgment, and as a result, the negligence of one beneficiary was a complete defense to a wrongful death action. (*Nudd v. Matsoukas* (1956), 7 Ill. 2d 608, 613, 131 N.E.2d 525, discussing *Hazel v. Hoopeston-Danville Motor Bus Co.*, 310 Ill. 38, 141 N.E. 392.) Plaintiff argues that the 1955 provision was aimed at this unduly harsh common law rule and was intended to grant relief to innocent beneficiaries who had previously been barred from any recovery

by a co-beneficiary's negligence. According to plaintiff, the purpose was not to punish the negligent beneficiary, but rather to benefit non-negligent co-beneficiaries by putting them in the same position as common law plaintiffs whose claims would not be barred by a coplaintiff's contributory negligence. Plaintiff argues that the legislature in speaking of contributory negligence was simply applying the common law principles which were then current to this statutory cause of action. As a result, plaintiff concludes that since the common law of contributory negligence was replaced in Illinois by the doctrine of comparative negligence pursuant to *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, applying comparative negligence in wrongful death cases to merely reduce recovery by a negligent beneficiary will give effect to the legislative intent in enacting the foregoing 1955 amendment to the wrongful death act and will place wrongful death beneficiaries on an equal footing with common law plaintiffs.

We agree with the plaintiff that, when dealing with a statute, our function is to give effect to the intent of the legislature. (*Henry v. St. John's Hospital* (1990), 138 Ill. 2d 533, 563 N.E.2d 410.) In ascertaining that intent, the rules of statutory construction require us to look first to the language of the statute as the best indication of legislative intent. (*Henry v. St. John's Hospital*, 138 Ill. 2d 533, 563 N.E.2d 410.) Where the language is plain and unambiguous, it is unnecessary "to search for any subtle or not readily apparent intention of the legislature." (*Kozak v. Retirement Board of the Fireman's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 216, 447 N.E.2d 394.) If the statute's language is unambiguous, it must be enforced as written. *Palladini v. City of East Peoria* (1985), 134 Ill. App. 3d 345, 347, 480 N.E.2d 530.

■ The above-quoted paragraph of the Wrongful Death Act clearly and unambiguously states that a contributorily negligent beneficiary shall not recover for the death which he caused in whole or in part. Even were we to speculatively agree with plaintiff's argument regarding the legislature's motive in enacting the statute, it is irrelevant. (*Henry v. St. John's Hospital*, 138 Ill. 2d at 542.) Our only function is to enforce the law as enacted, and we may not engraft new or different provisions onto the statute. In *Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 98, 476 N.E.2d 1378, the court found that superimposing comparative negligence onto section 2 of the Wrongful Death Act "would plainly be a forbidden judicial amendment to the statute." It would be incumbent upon the legislature itself to revise the Wrongful Death Act to make it more compatible with the emergent doctrine of comparative negligence. As a result, we have no choice but to enforce

814

the statute as enacted and hold that the trial court was correct in refusing to apply comparative rather than contributory negligence principles. See Justice Ryan's dissent in *Alvis v. Ribar*, 85 Ill. 2d at 38 ("Today's decision, of course, can have no effect on those legislative enactments which have incorporated contributory negligence").

■ We also must reject plaintiff's contention that the dissimilarity of treatment accorded to wrongful death beneficiaries compared to common law plaintiffs violates the equal protection clause of the Illinois Constitution. After the 1955 amendment to the Wrongful Death Act, wrongful death beneficiaries were treated in the same manner as common law plaintiffs: Contributory negligence barred recovery by both. When the judiciary adopted comparative negligence in 1981 in *Alvis v. Ribar*, it bettered the position of common law plaintiffs by allowing them to recover notwithstanding their own negligence, while negligent wrongful death beneficiaries remained barred from any recovery. It is this difference in treatment which plaintiff claims is in violation of equal protection. We do not agree.

The Wrongful Death Act, being a statutory cause of action unknown at common law, necessarily created a distinct class of persons, namely, beneficiaries entitled to recover under its provisions. (*Hall v. Gillins* (1958), 13 Ill. 2d 26, 147 N.E.2d 352; *Bruce v. Halterman-Flynn* (1987), 162 Ill. App. 3d 248, 515 N.E.2d 410.) "It is well established that '[t]he Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination.' [Citation.] The legislative classification is presumed to be valid and will not be set aside if any state of facts may reasonably be conceived to justify it." (*Bruce v. Halterman-Flynn*, 162 Ill. App. 3d at 252, quoting *Buzz Barton & Associates Inc. v. Giannone* (1985), 108 Ill. 2d 373, 381, 483 N.E.2d 1271.) The legislature clearly could choose to limit recovery under the statute to nonnegligent beneficiaries. There is no discrimination in such a distinction.

The fact that common law plaintiffs are treated differently from wrongful death beneficiaries has repeatedly withstood equal protection challenges. (See *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979* (7th Cir. 1981), 644 F.2d 594, 608-10 (disallowance of punitive damages in wrongful death actions not a violation of equal protection); *Bruce v. Halterman-Flynn*, 162 Ill. App 3d at 252 (court finds no equal protection violation in fact that wrongful death counterclaim must be commenced within two years as provided in the statute, while common law personal injury counterclaim not so limited

stating "the legislature created the class of persons protected by the Wrongful Death Act when no such cause of action previously existed"); *Hall v. Gillins*, 13 Ill. 2d 26, 147 N.E.2d 352 (limitation on recovery in wrongful death action not unconstitutional).) We agree with the statement made by the court in *Hall v. Gillins*:

> "In our opinion the constitutional question is not formidable when it is considered in the context of the situation that existed when the statute was originally enacted. At that time no action whatsoever was permitted for a wrongful death. The legislature took away no right when it enacted the statute. It created both the right and the remedy." 13 Ill. 2d at 29.

Moreover, the disparate treatment may be justified on the basis of the classes of persons involved. One whose negligence contributes to his own injury or death is not a tortfeasor. (See *Laue v. Leifheit* (1983), 120 Ill. App. 3d 937, 458 N.E.2d 622 (lack of due care for one's own safety is not tortious).) Such an individual, whether a plaintiff in a common law action or the decedent in a wrongful death case, is treated similarly in both cases. In both cases comparative negligence principles will be applied to reduce any recovery in proportion to that person's negligence. (Compare *Alvis v. Ribar*, 85 Ill. 2d 1, 421 N.E.2d 886, with *Ralston v. Plogger*, 132 Ill. App. 3d 90, 476 N.E.2d 1378 (in wrongful death action, negligence of decedent will reduce recovery to beneficiaries).) In contrast, a party such as the beneficiary to a wrongful death action who contributes to the death or injury of another is a tortfeasor and as such is not entitled to recover any benefit from his wrongdoing. (See *Zawaski v. Frainey* (1986), 149 Ill. App. 3d 1045, 501 N.E.2d 870.) On this basis alone, the disparate treatment may be justified.

It may further be noted that the bar against recovery by a contributorily negligent beneficiary was enacted prior to the court's determination in *Alvis v. Ribar*. There was no disparity of treatment at the time of the 1955 enactment.

Plaintiff's second contention is that the court erred in not granting a directed verdict on the issue of the contributory negligence of the decedent's husband. Plaintiff argues that to totally bar recovery, contributory negligence must be substantial, citing *Peterson v. Campbell* (1982), 105 Ill. App. 3d 992, 434 N.E.2d 1169, and that the alleged negligence of the decedent's husband in failing to get help for his wife on Saturday morning does not rise to that level. As a result, plaintiff urges that the question should not have gone to the jury but rather that the court should have directed a verdict in his favor. Under the facts of this case, we conclude that the trial court properly

submitted the question of the husband's negligence to the jury and that the evidence supports the jury's verdict.

The issue of contributory negligence is ordinarily a question of fact to be determined by the trier of fact. (*Bothun v. Wallace* (1978), 61 Ill. App. 3d 365, 377 N.E.2d 1054.) A directed verdict is appropriate only when all the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. (*Bothun v. Wallace*, 61 Ill. App. 3d at 367, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. See also *Peterson v. Campbell*, 105 Ill. App. 3d 992, 434 N.E.2d 1169.) If reasonable persons might draw different conclusions as to the facts or inferences to be drawn from the facts, a directed verdict on the question of contributory negligence should not be granted. *Peterson v. Campbell*, 105 Ill. App. 3d 992, 434 N.E.2d 1169.

■ Here, there was no dispute that the decedent's husband did not seek help for his wife before she collapsed in the neighbor's apartment on Saturday afternoon. Nor is there any dispute that he was aware that she was losing significant amounts of blood and was in pain. Plaintiff's own expert testified that, based upon the amount of blood found in her abdomen during surgery, the pain had to have been severe and increasing in intensity. On Saturday morning, the decedent had asked her husband to call the doctor that day. Certainly, under these facts, the trier of fact could conclude that a reasonable person would have sought medical help and that Chung Gie's failure to do so constituted contributory negligence.

In *Biundo v. Christ Community Hospital* (1982), 104 Ill. App. 3d 670, 432 N.E.2d 1293, the plaintiff alleged that the decedent was neglected by the hospital staff and was driven by excessive pain to jump or fall from his hospital window. The court held that, under the facts presented, the question of whether patient's wife was contributorily negligent in not contacting the doctor herself when patient was in pain was a question for jury. Here, too, the question of whether the decedent's husband was contributorily negligent in not seeking help for his wife was one for the jury. As a result, we see no error in the court's denial of plaintiff's motion for a directed verdict.

The jury concluded that the decedent's husband was contributorily negligent as evidenced by the verdict they returned. We find that determination to be supported by the record and we will not substitute our judgment for that of the jury. *Gettemy v. Grgula* (1975), 25 Ill. App. 3d 625, 628, 323 N.E.2d 628.

The case of *Tozzi v. Testa* (1981), 97 Ill. App. 3d 832, 423 N.E.2d 948, cited by plaintiff, is distinguishable. There the defendant was a professional arc welder who alleged that the plaintiffs were guilty of contributory negligence by their failure to serve as "fire watchers" while he was welding at their warehouse. The jury returned a verdict in favor of the defendant which was reversed on appeal. The appellate court found that there was no basis for the finding of contributory negligence by the plaintiffs, a finding based on the fact that the plaintiffs had asked the defendant about the risk of fire but were assured by him that there was no risk. As a result, the court concluded that as a matter of law, the plaintiffs were guilty of no negligence. Here, there is no evidence that the decedent or her husband had any such assurances from the defendant. The decedent's husband never spoke with the defendant. The defendant testified that rather than giving the decedent any assurances, he told her that she was at risk of dying. If anything, the warnings of the defendant to the decedent if communicated by the decedent to her husband would have increased the husband's awareness of the danger. Accordingly, we find *Tozzi* to be of little assistance to the plaintiff here.

Plaintiff's third issue on appeal involves the Illinois Dead Man's Act, which provides:

"In the trial of any action in which any party sues or defends as the representative of a deceased person or person under legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, except in the following instances:

(a) If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, an adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." (Ill. Rev. Stat. 1981, ch. 110, par. 8—201(a).)

Plaintiff contends that the court erred in allowing the defendant to testify to his conversations with the decedent. Specifically, plaintiff urges that it was error to allow the defendant to explain why there was no telephone number on the decedent's office record, and also to testify regarding the advice he gave to her beyond what was written in his records. Plaintiff argues that at no time during his examination

of the defendant as an adverse witness did he ask the defendant about any conversations he had with the decedent, but simply established the absence of a phone number in Dr. Wu's records, Dr. Wu's impressions of the decedent's condition, and the fact that the doctor did nothing after learning of the ultrasound test results. Plaintiff contends that this questioning of the defendant did not involve the content of any conversations with the decedent, and as a result did not "open the door" to such testimony or waive the protections of the statute.

Defendant counters that the door was opened by plaintiff's questions about whether it was "possible" or "conceivable" that the decedent thought that he had her phone number, questions which defendant contends could be answered only by relating part of his conversation with the decedent. In addition, defendant urges that the entire conversation between the defendant and the decedent was placed in issue when the plaintiff filed his complaint asserting that the defendant was negligent in failing to obtain information from her and in failing to impress on her the urgency of her condition.

As a general rule, the Dead Man's Act prohibits testimony by a person whose interests are adverse to the deceased about matters which the decedent could have refuted. (*Vazirzadeh v. Kaminski* (1987), 157 Ill. App. 3d 638, 510 N.E.2d 1096.) However, subparagraph (a) provides that if the deceased's representative waives the protection of the Act by introducing testimony otherwise prohibited, the opposing party is permitted to present testimony concerning the same conversation or event. The goal of the Act is fairness, and its purpose is to put the parties on equal footing. (*Wasleff v. Dever* (1990), 194 Ill. App. 3d 147, 154, 550 N.E.2d 1132.) The purpose of the exception is to prevent the trier of fact from being presented with a one-sided picture of the conversation or event. (*Groark v. Anderson* (1991), 222 Ill. App. 3d 880, 885, 584 N.E.2d 468.)

> "The justice of this rule is too apparent to require discussion. It would be palpably unjust if a litigant were permitted to call an adverse party and examine him as to one fact or phase of a transaction in his favor and then invoke the bar of the statute when the party examined sought to testify further with regard to the same transaction for the purpose of explaining his former testimony or correcting an erroneous impression left thereby." *Perkins v. Brown* (1948), 400 Ill. 490, 497, 81 N.E.2d 207.

■ Here, on direct examination of the defendant as an adverse witness, plaintiff asked numerous questions regarding the lack of a

telephone number in his office records. The questions clearly went beyond merely establishing that there was no telephone number on the record. By asking the defendant if it was "conceivable" or "possible" that the decedent thought the defendant had a number at which he would call her, plaintiff was implying that she had given the doctor a number but he had not written it in his records. Defendant was entitled to explain why these inferences were incorrect. Thus, we hold that the plaintiff waived the protection of the Act by the questions asked regarding the absence of the telephone number, and opened the door to allow the defendant to explain what in his view had occurred and why he did not have her phone number.

■ As to plaintiff's contention that the defendant should not have been allowed to testify to the advice he gave to the decedent beyond what was written in the records, we likewise find no error. The allegations against defendant all stem from the meeting and conversation between the decedent and the defendant in the defendant's office on November 2. Plaintiff alleged that the defendant's failure to impress on decedent the urgency of her situation was negligence. Plaintiff also alleged negligence in defendant's failure to obtain a phone number from the decedent and his failure to contact her with the results of the ultrasound test. To allow the plaintiff to make these allegations and then to claim the Dead Man's Act as a bar to defendant in explaining what had happened would be palpably unjust and in direct contravention of the Act's goal of fairness.

We believe the cases of *Perkins v. Brown, Wasleff v. Dever* and *Zorn v. Zorn* (1984), 126 Ill. App. 3d 258, 464 N.E.2d 879, are persuasive on this point. In *Perkins*, the defendant wished to explain his testimony as an adverse witness by testifying to conversations which he had with the decedent in the months prior to his death. In holding that such testimony should be allowed, the court stated:

> "Appellants having called Brown to testify and elicited from him the statement that he had received a deed for the property from the deceased and that he did not pay her for it or buy it from her, it was entirely proper to permit him to explain the entire transaction with the deceased, including the conversations had by her with him concerning the conveyance of the property, as such conversations were a part of the transaction inquired about by appellants." (*Perkins v. Brown*, 400 Ill. at 497.)

In *Wasleff*, defendant was alleged to have withdrawn monies from decedent's bank account without authorization. The court held that the Dead Man's Act did not bar defendant's testimony about conversa-

tions she had with the decedent in which he granted her withdrawal authority. "[B]ut for the exception set forth in the Dead Man's Act, the defendants would not have been on equal ground in defending plaintiff's claim of an unauthorized withdrawal." (*Wasleff v. Dever*, 194 Ill. App. 3d at 154.) In *Zorn*, defendants were charged with exerting undue influence to obtain a deed from the decedent. The court held that it was error to prevent the defendant from testifying to conversations with the decedent to rebut those charges.

Here, plaintiff elicited testimony from the defendant regarding Yen Yen's office visit, his diagnosis of a possible ectopic pregnancy or miscarriage, and the fact that his office records did not contain a phone number. Standing alone, this testimony could leave the jury with the impression that the defendant did not explain his possible diagnosis to the decedent or inform her of the potentially life-threatening nature of her condition. Based on the principles set forth in *Perkins*, *Wasleff*, and *Zorn*, we find no error in the admission of defendant's testimony regarding his advice to Yen Yen.

Plaintiff argues, however, that a distinction should be made between an "event" and a "conversation," and that since he introduced no testimony about conversations between the decedent and Dr. Wu, there was no waiver so as to allow defendant's testimony regarding that conversation. It is true, as plaintiff points out, that this court made such a distinction in *Vazirzadeh v. Kaminski*, 157 Ill. App. 3d 638, 510 N.E.2d 1096. There we held that testimony by the decedent's widow concerning a conversation she had with her deceased husband did not constitute a waiver to allow the defendant to testify to an entirely separate conversation he had with the decedent, nor did the decedent's entire hospitalization constitute an "event" within the meaning of the statute so as to allow testimony regarding the later conversation. Here, however, we are dealing with a single "event," the meeting between defendant and Yen Yen on November 2, and a single conversation between them at that time. As a result, we do not find the distinction made in *Vazirzadeh* applicable so as to bar defendant's testimony here.

We are not unmindful, however, of the comment by the majority in *Zorn v. Zorn*, which stated "[t]he matter must be handled on a case-by-case basis, each one dependent on its own facts, and, of course, the basic principle of relevancy will act as a restraint upon unbridled application of the rule. We hold that on the facts of this case, it was error to exclude the evidence." (*Zorn v. Zorn*, 126 Ill. App. 3d at 263-64.) We too are not advocating an unbridled application of the rule, but certainly the facts of this case well warrant this application.

Accordingly, we find no error in the trial court allowing defendant's testimony regarding his conversations with the deceased in this case.

Finally, we address defendant's claim in his cross-appeal that he was entitled to a directed verdict in his favor because the evidence failed to establish that his conduct caused the decedent's death. The standard discussed above in regard to plaintiff's argument for a directed verdict on the question of contributory negligence also applies here. A directed verdict should be granted only when all the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could stand. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504.) Our review of the record indicates that the court correctly denied defendant's motion.

■ Although defendant argues that plaintiff presented no evidence that the decedent would have acted any differently had she known that the results of the ultrasound confirmed the ectopic pregnancy, the record indicates otherwise. Chung Gie testified that after they received the results of the test from Dr. Wu, it was their plan to find another doctor closer to home. According to the decedent's husband, the course of conduct of his wife and himself depended upon what they would have heard from the defendant concerning the results of the ultrasound test. Thus it could be inferred that they would have acted differently had the defendant communicated the results to them. In addition, the defendant told the decedent that her pain and bleeding could be caused by either an ectopic pregnancy or a miscarriage. There was testimony by Sue Wang that the decedent thought she had suffered a miscarriage, a condition which was not of the same degree of urgency as an ectopic pregnancy. Had the defendant communicated that the ultrasound test indicated an ectopic pregnancy rather than a miscarriage, it is not unreasonable to infer that medical help might have been sought sooner. Thus, applying the *Pedrick* standard, we conclude that the trial court did not err in denying defendant's motion for a directed verdict.

Defendant cites two "failure to inform" cases in which the courts held that the plaintiff had failed to establish that a reasonable person would have acted differently had the information been provided. (See *Marshall v. University of Chicago Hospitals & Clinics* (1987), 165 Ill. App. 3d 754, 520 N.E.2d 740; *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 262 N.E.2d 156.) In *Marshall*, however, unlike the instant case, the court found that the only reasonable inference from the objective evidence was that a reasonable person in plaintiff's position would

have acted as plaintiff did. In *Green,* the court stated that the plain tiff had presented no evidence that the defendant's failure to inform had caused her injury. While we agree with the defendant that the plaintiff must establish that a reasonable person would have acted dif ferently had she known that the ultrasound test confirmed the ectopic pregnancy, as discussed above, such evidence was presented here. As a result, we find these cases to be of little assistance to the defendant here.

Defendant also contends that he cannot be liable for the dece dent's death since the evidence affirmatively established that the de cedent's death was caused by her own failure to follow his instruc tions. In support, he cites *Krauss v. Ballinger* (1912), 171 Ill. App 534, *Littlejohn v. Arbogast* (1901), 95 Ill. App. 605, and *Haering v Spicer* (1900), 92 Ill. App. 449, in which the courts held that a physi cian is not liable for his negligence when the patient fails to follow hi instructions. Those cases, however, were decided at a time when the negligence of the decedent was a total defense. Today, principles o comparative negligence are applicable to negligence by the decedent and a decedent's negligence serves only to reduce any recovery by the beneficiaries. (*Ralston v. Plogger,* 132 Ill. App. 3d 90, 476 N.E.2 1378. See also *Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 44 N.E.2d 1085.) Thus, assuming that defendant is correct that the dece dent was negligent, defendant would not be entitled to a directed ver dict on that basis alone.

Accordingly, for all the above reasons, the judgment of the circui court of Cook County is affirmed.

Affirmed.

McNULTY, P.J., and MURRAY, J., concur.